UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

UNITED STATES OF AMERICA,              )
                                       )
     PLAINTIFF,                        )  CASE NO. 2:25-mj-270
                                       )
          vs.                          )
                                       )
RONALD LIDDERDALE,                     )
                                       )
     DEFENDANT.                        )
_____           )

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE JAMES L. GRAHAM, SENIOR JUDGE
WEDNESDAY, JULY 16, 2025; 1:32 P.M.
COLUMBUS, OHIO

    FOR THE PLAINTIFF:
        Kelly A. Norris
        Acting United States Attorney
        By:  Brian Martinez
             Damoun Delaviz
        Assistant United States Attorney
        303 Marconi Boulevard, 2nd Floor
        Columbus, Ohio 43215

    FOR THE DEFENDANT:
        Federal Public Defender's Office
        By:  Stacey L. MacDonald, Esq.
        10 West Broad Street, Suite 1020
        Columbus, Ohio 43215

                         - - -

    Proceedings recorded by mechanical stenography, transcript
produced by computer.

2

Wednesday Afternoon Session

July 16, 2025

- - -

(The following proceeding was held in open court.)

DEPUTY CLERK:  Case number 2:25-mj-270, the United States of America versus Ronald E. Lidderdale.

THE COURT:  Good afternoon, ladies and gentlemen. Welcome to the United States District Court for the Southern District of Ohio.

The Court will recognize Assistant United States Attorney Brian Martinez.

MR. MARTINEZ:  Good afternoon, Your Honor.

THE COURT:  Good afternoon, Mr. Martinez.

Is the government ready to proceed on this case?

MR. MARTINEZ:  Indeed we are, Your Honor.

THE COURT:  Very well.  Would you please describe the status of this case.

MR. MARTINEZ:  Yes, Your Honor.

The defendant, Mr. Lidderdale, has been charged by way of a criminal complaint with interstate communications with threats to kidnap or injure, mailing threatening communications, false information and hoaxes, and cyberstalking.

On July the 8th of this year, Magistrate Judge Jolson, after holding two detention hearings, issued an order that

Mr. Lidderdale be released on conditions.

Shortly thereafter, the government filed a motion to review and revoke that detention order.

We are here today for a hearing today on the government's motion.

THE COURT:  Very well.  Thank you, Mr. Martinez.

I believe the defendant is represented by United States Public Defender Stacey Lee MacDonald.

Am I correct, Ms. MacDonald?

MS. MacDONALD:  Yes, Your Honor.

THE COURT:  Good afternoon to you, and please introduce your client to me.

MS. MacDONALD:  Yes, Your Honor.  This is Ronald Lidderdale, who is seated to my right.

THE COURT:  All right.  You may stand, sir.

Are you Ronald E. Lidderdale?

THE DEFENDANT:  Yes, I am, Your Honor.

THE COURT:  And Ms. MacDonald is your attorney; is that correct?

THE DEFENDANT:  She is.  Yes, Your Honor.

THE COURT:  All right.  Very well.  Thank you.  You may be seated.

The government's motion calls upon the Court to conduct a *de novo* -- that is, start from the beginning -- review of the facts and circumstances of this case in order to determine

4

whether or not the defendant, Mr. Lidderdale, should remain in custody pending trial or other disposition of this case, or whether he should be released on bond under conditions, and that is the issue before the Court this afternoon.

Now, we do have a record in this case which has been created as a result of the proceedings before the magistrate judge, Judge Jolson, and so the Court's first question to counsel in this case will be whether or not counsel for either side wishes to introduce evidence in addition to the evidence contained in the existing record.

Mr. Martinez, what's the government's position?

MR. MARTINEZ:  Your Honor, today the government will rest on the existing voluminous record.

THE COURT:  All right.  Ms. MacDonald?

MS. MacDONALD:  Your Honor, I would incorporate the prior record, but I would proffer for the Court some information, specifically that Melanie Adams, Mr. Lidderdale's mother, is present in court.

She has appeared at all previous hearings.  She is retired, resides at the address that Pretrial Services had recommended release of Mr. Lidderdale to on home confinement.

I have reviewed with her what it would be to be a third-party custodian -- essentially, to be able to monitor Mr. Lidderdale while they are home together, to make sure that he is complying with any of the Court's orders and report if

5

there was any noncompliance to a Pretrial Services officer. She is willing to do any and all of that for the Court.

And should the Court have questions, I could call her to the stand, but I would just proffer her in the meantime.

THE COURT:  All right.  Mrs. Adams, please stand.  Is what counsel just said, all of those things, true?

MS. ADAMS:  Yes.

THE COURT:  All right.  Very well.  The Court appreciates your appearance here today.

All right.  Mr. Martinez, I would like to hear the government's position.

MR. MARTINEZ:  Yes, Your Honor.  Thank you.

Your Honor, I've been working in the U.S. Attorney's Office for 11 years.  This is the first time I have ever asked a district court judge to review and revoke a release order issued by one of our magistrates, and I say that because I think it highlights the seriousness with which we are taking this case -- and by me, I mean not only the U.S. Attorney's Office, but our partners in the FBI and the victims who have been affected by the case.

And when I first started working on this case, Your Honor, I was reminded of a case that we did several years back involving Congressman Steve Stivers.

Mr. Stivers, when he was a Congressman, received a single threat.  It was a voicemail left at his office on one

6

day threatening to kill him -- one threat against one official on one day.  Mr. Hoff was detained.

Mr. Lidderdale sent 90 threatening communications to roughly 30 public officials over a 10-month period.  Those communications threatened to kill the victims in the clearest and starkest of terms.  There was no question about what he was threatening to do.

And we've been very careful not to reveal the names of the officials who were threatened over and over again.  But I feel comfortable at least telling the Court today that that list of victims includes four holders of statewide office in Ohio, nine members of the Ohio House of Representatives, five members of the Ohio Senate, six members of the Ohio Supreme Court, four members of the U.S. House of Representatives, and one member of the United States Senate.

And Mr. Lidderdale's threats changed over time.  They escalated over time.  The manner in which he communicated those threats changed over time and got worse.

He started by sending letters in the United States mail, about a dozen of them.  He moved on to sending emails through Proton Mail, which is an encrypted email service based overseas.  It's difficult to track.

He then went back to letters through the U.S. mail, but this time he included a suspicious white powder in the letters that he wanted the victims to believe was poison.  There were

somewhere between 40 and 50 of those letters with the powder in them.

He then moved, Your Honor, to sending what I'll call a kill list, a list of eight or nine officials that he said: "I'm going to start with you.  You are first.  You are going to die first."

And finally, Your Honor, he sent to a public official in Ohio a bullet, a 9-millimeter round, with that public official's name etched into the casing.  The bullet literally had the victim's name on it.

And he was able to do this for ten months, Your Honor, ten months, despite an intensive FBI investigation, because of the operational security measures that he employed to avoid detection and apprehension, and those steps included wearing gloves when he handled the mail to make sure we weren't able to get any forensic evidence off the envelopes or the letters. They included going to different post offices, different mailboxes, to mail the letters so there was no pattern of activity.  It included manipulating the return addresses on the mailings to throw us off the scent.  It included, as I said before, Proton Mail.

THE COURT:  What is Proton Mail?

MR. MARTINEZ:  Proton Mail is a service.  I think it's based in Switzerland.  It's a service to send emails.  It's encrypted, end-to-end encrypted, which means it's hard for law

8

enforcement to get the communications and hard to track the communications.

He also when he was sending emails used what are called virtual private networks to also further shield him and make him anonymous. All so law enforcement couldn't catch him.

Finally, after ten months, Your Honor, the FBI engaged with him, answered one of his communications, and there was a few days of back and forth communication between Mr. Lidderdale and the FBI, and they de-escalated the situation and convinced him to come to the FBI building.

The way the agents have described it to me, Your Honor, they treated it like a hostage situation. They treated it like a barricade situation without a barricade, and they did a great job of de-escalating and getting him to come into the FBI, which he did. And when he got there, he confessed during a lengthy interview.

Shortly thereafter, his home, the home that he shares with his purported third-party custodian, was searched. And agents found the tools that he would have used to send the threatening communications -- envelopes, stamps, a glue stick, address labels, a little scale to weigh the envelopes so you know how much postage to put on, latex gloves, cell phones, computers. And they also found the tools that he could have used to carry out these threats. Two semiautomatic firearms, 99 rounds of ammunition, not a hundred rounds, because he used

one round to etch the name in and send to a victim.

THE COURT: Mr. Martinez, where in the record can I find some evidence regarding these weapons?

MR. MARTINEZ: They are in -- we have photographs, Your Honor, as one of the exhibits.

THE COURT: All right. I would like to see them.

MR. MARTINEZ: Yes, as one of the exhibits. That's right.

THE COURT: Are you going to put them --

MR. MARTINEZ: They were admitted -- they were admitted during the last detention hearing, Your Honor.

THE COURT: Okay. I would like to see them.

MR. MARTINEZ: Okay. We have copies here.

May I approach, Your Honor?

THE COURT: Yes, you may.

MR. MARTINEZ: We have search warrant photos that are marked as exhibits.

THE COURT: Where were the guns found?

MR. MARTINEZ: In the home, Your Honor.

THE COURT: Where in the home?

MR. MARTINEZ: In the -- in the bedroom, we believe, Your Honor.

There are a number of pictures. Your Honor, I believe only two or three show the firearms.

THE COURT: Is there anyplace in the record where I

can see a description of these firearms and verification that they are, in fact, what they appear to be in the photographs?

MR. MARTINEZ:  Your Honor, I don't think there's any dispute.  I don't think the defense has even disputed that they are, in fact, firearms.

There were two double 9-millimeter firearms, and there were 99 rounds of 9-millimeter ammunition found.  And I believe he also said, Your Honor -- in his interview, he admitted to having the guns.

MS. MacDONALD:  Your Honor, the defense wouldn't dispute that there were two firearms.

I would note that Mr. Lidderdale was not prohibited from owning firearms.  He has no prior criminal history or anything that would prohibit him.

And in the statement from the mother to FBI, she noted that he had, at the urging of a sister --

THE COURT:  So are you objecting to the -- to this evidence of these firearms?

MS. MacDONALD:  No, Your Honor.

THE COURT:  All right.  Did I hear you say that there were not two firearms?

MS. MacDONALD:  No, Your Honor.  I was just --

THE COURT:  Were there two firearms?

MR. MARTINEZ:  Yes.

THE COURT:  Were they both pistols?

MR. MARTINEZ:  Two 9-millimeter pistols.

THE COURT:  Two 9-millimeter pistols and 99 --

MR. MARTINEZ:  Rounds.

THE COURT:  -- rounds of ammunition for them.

MR. MARTINEZ:  Correct.

THE COURT:  There was -- it appears to have been -- they had the -- did they have some special kind of holster?

MR. MARTINEZ:  Yeah.  One of the items that was found, Your Honor, there was some clothing that we would -- I would define or was described to me as tactical gear, and there was a holster called a drop holster, Your Honor, which is a certain kind of holster which is typically worn to go along with body armor.

So, the drop holster sits lower on your leg as opposed to up on your hip, and it's very helpful when someone is wearing body armor because it's easier to draw.  The body armor doesn't get in the way.  So there was a holster like that in the house.

There was also a lockpicking kit.  A lockpicking kit.  Mr. Lidderdale worked in a furniture store, Your Honor.  He had no need for a lockpicking kit.

THE COURT:  All right.  Again, there were two of these pistols?

MR. MARTINEZ:  Two firearms.

THE COURT:  Not just one?

MR. MARTINEZ:  Two firearms, Your Honor.

THE COURT:  All right.  Go ahead.

MR. MARTINEZ:  But the story of what Mr. Lidderdale did isn't really complete until we talk about the harm to the victims, Your Honor, the recipients of those threats.

Imagine being a public official and there is someone out there like Mr. Lidderdale who knows your name, knows where you live, knows where you work, knows who your family members are, and you are getting these threats not only at your office but at your home, and he's threatening to kill you because of what you believe in, what you stand for, what your positions are on public policy.

He hates you so much that he repeatedly threatens to kill you and, in some instances, says:  "I might kill your wife while I'm there too."

Or imagine being one of those staff members who works for an elected official, who is sorting the mail, and you open an envelope and you see white powder, and in that moment you don't know if you are going to get sick or whether you are going to die.

Or being an elected official who has a hazmat team come to your home that you share with your wife or your children to pick up a package that was just in your mailbox or just on your kitchen counter.

He traumatized these people, Your Honor.

THE COURT: Is that what actually happened here? Were hazmat teams called to the scene --

MR. MARTINEZ: Absolutely.

THE COURT: -- when the recipients of these envelopes with white powder opened them and saw that there was a white powder?

MR. MARTINEZ: That is the standard procedure, Your Honor.

THE COURT: And what do those hazmat teams do when they get there?

MR. MARTINEZ: Well, from my understanding -- and I'm certainly not an expert -- they come in in their hazmat clothing. They take the materials using various safety and security measures. They remove them from the premises, and they often -- in this case, they are sent off to a lab to be tested.

THE COURT: And then I assume they test them and determine what the material is?

MR. MARTINEZ: Correct. Correct.

THE COURT: How long does that take?

MR. MARTINEZ: It depends. This case, we've done a lot of the testing, and the material was not actually poison. We can --

THE COURT: Well, I understand that, but how long did the people have to wait to know what they had been exposed to?

MR. MARTINEZ: I don't know the answer to that question, Your Honor.

THE COURT: All right.

MR. MARTINEZ: I'm sorry. I don't.

THE COURT: You know it wasn't at least immediate?

MR. MARTINEZ: No, it's not in that moment. That's exactly right.

And because of this trauma, over ten months, I can't imagine a more serious case involving threats than cyberstalking, I just can't, given the number of victims, the nature of the threats, and how long it went on.

I'll move to the second factor, Your Honor: The weight of the evidence of dangerousness in this case. And in a case like this, I think the weight of the evidence of dangerousness sort of overlaps with the weight of the evidence of the guilt because a defendant who repeatedly engages in dangerous conduct is a dangerous person.

THE COURT: Now, this man made a statement to the FBI.

MR. MARTINEZ: He did.

THE COURT: Is that statement in the record somewhere?

MR. MARTINEZ: We summarized it in the criminal complaint, Your Honor, but the actual four-hour interview, we did not put into the record.

THE COURT: Has a criminal complaint been filed?

MR. MARTINEZ: Yes, Your Honor.

THE COURT: Do I have a copy of it?

MR. MARTINEZ: Yes. I've got a copy here too. It's document number 1 in the case.

May I approach?

THE COURT: Has he responded to the criminal complaint?

MR. MARTINEZ: No.

THE COURT: All right. So what do you mean by a criminal complaint?

MR. MARTINEZ: So a criminal complaint supported by an affidavit seeking an arrest warrant for him was filed back in May, signed off by the magistrate judge.

THE COURT: So tell me what the procedure then would have been. Is he required to respond to this criminal complaint?

MR. MARTINEZ: No, Your Honor. No.

THE COURT: So what's the next step in the case?

MR. MARTINEZ: Well, the next step would be one of two things, I suppose.

THE COURT: Has he entered a plea?

MR. MARTINEZ: No, no, because he hasn't been charged by indictment yet, Your Honor. So he would either be indicted or the parties could reach some sort of pre-indictment resolution. One of those two things would happen next.

THE COURT: So what's going to happen?

16

MR. MARTINEZ: We are in conversations with defense counsel about that, Your Honor.

MS. MacDONALD: Your Honor, defense has only just received the discovery pursuant to a protective order, so I think it's too early in the case to determine how the case will proceed at this point.

THE COURT: All right. So all we have right now is the criminal complaint?

MR. MARTINEZ: That's the operative charging document, Your Honor, and the affidavit attached to the complaint which was sworn out by an FBI agent.

THE COURT: And it charges various offenses under the United States Code, including interstate communications with a threat to kidnap or injure; and under another separate section of the United States Code, mailing threatening communications; and yet another section of the United States Code, false information and hoaxes; and another section, cyberstalking.

That's what the criminal complaint charges him with?

MR. MARTINEZ: Yes, Your Honor. That's correct.

THE COURT: All right. Now, he was -- he made a statement to the FBI. Tell me again where I can find that.

MR. MARTINEZ: That's in the criminal complaint, Your Honor. If I can -- give me a moment --

THE COURT: There's a summary of it in the complaint?

MR. MARTINEZ: Yes. And if the Court will give me a

moment, I'll point to the paragraph numbers.

THE COURT:  All right.

MR. MARTINEZ:  I believe that the summary begins on paragraph 27.

THE COURT:  All right.  It says:  "On the morning of May 8th, 2025, the sender, Lidderdale, drove to the FBI office in Columbus.  He was provided with *Miranda* warnings."

In other words, he was advised of his right to have counsel and his right to refuse to answer questions and so forth.

It says:  "He admitted sending threatening communications to Ohio officials, admitted many characteristics of the crime known only to the perpetrator and investigators, and he admitted to certain specific letters."

Is that correct, Mr. Martinez?

MR. MARTINEZ:  Yeah.  He admitted -- basically, Your Honor, I don't think he can remember all 90 of the communications, but he admitted to sending letters to the mail. He admitted to sending letters with white powder.  He admitted to sending emails.  He admitted to sending the bullet with the name on it, so on and so forth.

THE COURT:  All right.  Mr. Martinez, you may proceed. Anything further?

MR. MARTINEZ:  Yes, sir.  I have a bit more if that's okay?

18

THE COURT: Yes.

MR. MARTINEZ: As we go through the factors under the Bail Reform Act, we have to look forward and consider the type of danger that Mr. Lidderdale poses if he were to be released, and I submit to the Court there's two types of danger that he poses in this case.

First is the risk that he would engage in similar threatening behavior, that he could continue to send letters, emails, to these victims or others, and courts that have analyzed these cases have really latched on to that possibility, because now the victims of his threats have become witnesses against him.

In this case, if we were to have a trial, the victims would be witnesses, and so a defendant in that circumstance has an incentive --

THE COURT: Well, he's already said he's going to kill them in the letters he sent them.

MR. MARTINEZ: Correct.

THE COURT: And he admits he sent the letters?

MR. MARTINEZ: Correct.

THE COURT: Why can't we take his word for that?

MR. MARTINEZ: Oh, I believe that we can, Your Honor. I believe that we can.

The concern that I have, Your Honor, is twofold. One is, if he were to be released, he could continue to threaten

19

them.  The second is that he would try to kill them.

We can take him at his word, as Your Honor just said, and there are reasons to believe that that might happen.

Again, he had firearms.  He had ammunition.  He had a lockpicking kit.

THE COURT:  And his victims now know that.

MR. MARTINEZ:  Correct.

THE COURT:  If they didn't know that before --

MR. MARTINEZ:  That's correct.

THE COURT:  -- they know it now, don't they?

MR. MARTINEZ:  They certainly do, and his victims are very --

THE COURT:  And they know this man who threatened to put bullets in their head --

MR. MARTINEZ:  Right.

THE COURT:  -- and all of this horrible stuff that he says in his letters, and it's very graphic, they know that he had the means to do it.

MR. MARTINEZ:  Yes.  They are paying very close attention, Your Honor.

THE COURT:  All right.

MR. MARTINEZ:  They are.  And remember, he has knowledge of where they live and work.  He had their home addresses for some of these officials, their home addresses.

THE COURT:  One of them, he refers to killing him in

the temple.  Apparently he knew his place of worship.

MR. MARTINEZ:  I believe that's right, Your Honor.

And at the risk of stating the obvious, we have to consider this crime in the time in which it was committed, a time in this country where we have to worry about political violence, because we have seen public officials --

THE COURT:  Yes.  I made myself a list of some of those and, in fact, you identified one of them, and that was the shooting of Congressman Scalise.

MR. MARTINEZ:  That's exactly right.

THE COURT:  But there have been a lot of them.

For instance, the June 14th, 2025, killing of Minnesota State Representative Melissa Hortman and her husband Mark in Brooklyn Park, Minnesota.  The same person shot and injured Senator John Hoffman and his wife Yvette.

A related situation, which was even mentioned by Mr. Lidderdale in his letters, would include the assassination of the CEO of UnitedHealthcare by this -- this individual, Luigi Mangione, on December 4th, 2024.

And Mr. Lidderdale referred to that in his communications to these folks, didn't he?

MR. MARTINEZ:  Over and over again, Your Honor, repeatedly.

THE COURT:  And we've got the July 13th, 2024, attempt on the life of then-candidate Trump and a second attempt on his

21

life in September.

We had the October 28th, 2022, attack on the husband of Congresswoman Nancy Pelosi. We have Judge Salas, whose adult son was killed, and the list goes on and on.

It's -- it's obvious that we have a national problem with this kind of violence and these kinds of threats.

MR. MARTINEZ: Your Honor literally read my mind.

I was going to go through a similar list of officials who were either harmed or threatened or plots were against them -- federal, state officials, governors.

I want to go back to the shooting of the folks in Minnesota that the Court just referred to. That happened since this case started. That happened after Mr. Lidderdale was arrested.

And as I was reading through some of the articles about the shooter in that case, immediately, to my mind, certain parallels I had made between the shooter in Minnesota and Mr. Lidderdale.

THE COURT: Lone wolf.

MR. MARTINEZ: Lone -- absolutely, lone wolf.

THE COURT: A person who is socially isolated.

MR. MARTINEZ: Correct. Someone who has strong views about politics, gets angry about politics, but those around him would say, "Well, we never thought he was going to be violent."

Both are educated -- usually a positive. Both are men

22

of faith -- usually a positive.

Both had financial problems, Your Honor. Both had no prior criminal record to speak of.

Both had access to the equipment, including firearms, they needed to carry out the attacks.

Both had created a hit list. Both of them, this idea "I'm going to create the list of the people that I'm going to kill, and I'm just going to go down the list."

The big difference, Your Honor, between the shooter in Minnesota and Mr. Lidderdale is law enforcement was not able to intervene in Minnesota like they were here. That's the difference.

And I expect what we're going to hear when it's Ms. MacDonald's turn is: "Well, the government has no evidence that Mr. Lidderdale ever tried to kill any of those victims. He never shot anyone."

Well, first and foremost, that ignores the harm that he did do by sending the threats. It ignores the trauma that he did cause, and it suggests that a defendant can't be detained unless he actually sheds blood. It suggests that we can't detain him until someone is actually shot in the face.

That can't be the test, Your Honor.

I expect we're going to hear: "Well, the FBI has already seized Mr. Lidderdale's materials. They took his guns and his holster and his ammunition and his computers and his

phones."

And I would say what if this were a drug trafficking case, Your Honor, and the defendant had his home raided by the police and they took his drugs? Would we then say he's no longer a danger because: "Well, we took his drugs. He can't hurt the public anymore"? Of course, we wouldn't say that.

If this were a terrorism case and someone was plotting to blow up the federal building here in Columbus, and the FBI intervened and took that person's bomb-making materials, would we say: "Well, the FBI took his materials. He's no longer a danger. Let's let him out on the street"? We would never say that.

And I might even hear that Mr. Lidderdale somehow cooperated with law enforcement, which I think is in Magistrate Judge Jolson's order, and I find it puzzling.

Mr. Lidderdale did not cooperate with law enforcement. He evaded them for ten months.

Had the defendant gone on a ten-month armed robbery spree in Ohio and done great harm for ten months, and then when the walls were closing in, he decided, "I'm going to turn myself in and confess," would we say he's no longer dangerous? Absolutely not.

And I'll remind the Court, and this is cited in our memorandum: Further evidence that the defendant didn't cooperate with law enforcement, he sent a letter to the FBI,

24

Your Honor, to the FBI -- and this is on page 6 of our memo -- where he says, and I'm going to quote some of this letter, Your Honor, 'cause I think it's compelling.

"I'm perplexed as to what the problem is with the FBI in trying to suppress and take down all of those who would seek to destroy this country through elections via manipulative cheating ways. All of these disgusting Fascist pedophilic Republicans running around following the Fascist ways of Musk and his subordinate senile fat pet Trump by constantly spreading conspiracy theories and lies eroding the principles and morals of this country."

He goes on and says: "I will kill them. I will kill all of them. I will do my best to exterminate every one of these parasitic Republicans on my list. And unlike the social justice execution of that parasite, Brian Thompson, again, it will be harder to find and catch me.

"This is my final warning to this office to take them down or I will have to take matters into my own hands by exterminating them all."

In no world is that cooperating with the government, Your Honor, by saying, "You arrest the people I don't like or I'm going to exterminate them myself."

A few final points. Your Honor described Mr. Lidderdale a little while ago as a lone wolf. I think that's right. He does have some things in his favor. He has ties to Ohio. He

has a stable residence with his mother.  He doesn't have any prior criminal record.  But all of those things were true -- all of those things were true when he committed these offenses.  He had the same support structure in place when he committed these offenses.

Now, what he has said -- what he has said is that he did this because of various things that were going on in his life: Family issues with his father, personal issues, financial struggles, political grievances.  But all those things are still true.  They haven't gone away.  They have been magnified.

And now he has the additional pressure of the United States government filing criminal charges against him and seeking to send him to prison for years.

In his own words, Mr. Lidderdale said to the FBI, right before he was arrested, that he had, quote, reached his boiling point.

The temperature on Mr. Lidderdale hasn't gone down, Your Honor.  It's gone up.  So all of these things, all of these stimuli that caused him to act out, they have gotten worse, not better.

The mental health assessment in this case supports detention, not release.

The defendant was not suffering under some crippling mental defect or disease when he committed these crimes.  He was clearheaded.  He knew what he was doing.

26

The best that the doctor could come up with was that he suffers from some form of depression and might need cognitive behavioral therapy.  That's the best she could say.

Lastly, Your Honor, given all the evidence in this case and the arguments of counsel today, there are no conditions or combination of conditions that can effectively mitigate the risk that Mr. Lidderdale poses or reasonably assure the safety of the community and his victims.

And the case law -- and we cited numerous cases in our memo -- say that in cases like this, these sorts of threats cases, there's very little pretrial supervision can do to stop this behavior, and the very conditions under which the magistrate wants to release Mr. Lidderdale has been rejected in these cases:  GPS monitoring, restrictions on electronic devices, mental health counseling, no contact with victims or witnesses.

These are all easy to evade.  The Court cannot stop him from buying envelopes, stamps, and paper.  The Court cannot stop him from using the U.S. mail.  The Court cannot stop him from buying a new cell phone or setting up a new Proton Mail account, and I would venture to say they can't even stop him from buying a firearm, Your Honor.

As Ms. MacDonald just said, he's not prohibited.  He could walk out of this courtroom today and go into any gun store or gun show in Ohio and buy a firearm.

27

GPS monitoring does not eliminate the risk of danger. It's helpful for risk of flight.  It doesn't go to danger.

If you've lived in Ohio for more than a few years, you know about Reagan Tokes, the Ohio State University student who was kidnapped, raped, sodomized, and murdered by a man wearing a GPS monitor on his ankle.

It doesn't help.

This idea he can live with his mother should be rejected out of hand.  He lived with his mother for the entire ten months he was sending these threats and saying:  "I'm going to put a bullet in your head."

She's in no position to supervise him, and, frankly, I don't believe she's going to rat out her own son to the government.

Someone, who is as committed to his crusade as Mr. Lidderdale is, is not going to be stopped by words on a piece of paper -- with all due respect to the Court -- because by the time a violation of those release conditions is detected, it's too late:  The letter has been sent.  The bullet has been fired.  The damage has been done.

And the government compels the Court not to take that risk or urges the Court, excuse me, not to take that risk.

So I'm going to end where I began, Your Honor.  I've never done this before.  I've never stood before a district court judge and asked to overrule a magistrate judge.  I've

never done it.  I hope I don't have to do it again.

But Mr. Lidderdale, he should be detained.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Martinez.

All right.  Ms. MacDonald?

MS. MacDONALD:  Thank you, Your Honor.

Your Honor, the charges that Mr. Lidderdale is faced with, there is a presumption of release in this case.  They are not ones that presume that he needs to be detained.

And in reading Magistrate Judge Jolson's order of release in this case, she did not take the allegations in this case lightly at all.  She heard two days of testimony.  She examined all of the exhibits that have been provided from this -- to this Court and weighed all of those factors very carefully.

The question isn't whether or not -- the question only -- isn't only whether or not there is potentially a danger here, but whether or not there are no conditions at all that can be imposed which could reasonably assure the safety of individuals in the community.

And Magistrate Judge Jolson, over those multiple hearings, over reviewing the evaluation by Dr. Veltri, after reviewing and speaking with Pretrial Services and their recommendations for release, came up with release conditions that she felt would reasonably assure the safety of the victims

in this case, the community, and Mr. Lidderdale; and they are significant conditions that she imposed, including keeping this case with her, getting weekly updates from Pretrial Services regarding Mr. Lidderdale and his mental health counseling.

So I would go over, Your Honor, the -- the four factors that Judge Jolson weighed in this case, as well as respond to some of the things that AUSA Martinez had mentioned.

Again -- so regarding the -- the cooperation with law enforcement that Mr. Martinez was discussing, what I want to make clear for the record is that for the -- the ten months that the letters, the threats were happening, law enforcement did not know, as the government said, who was sending them, that Mr. Lidderdale was being able to be incognito, and Mr. Lidderdale did not know, it appears -- again, I haven't gone through all the discovery yet -- that they had been closing in on him through an IP address.

But at the time that he reached out, that he reached out to law enforcement, to the FBI, and said that he was the one that they were looking for; that by May 8th or 9th he came in -- he met with them. He had been in contact with them. He has to know that he is being arrested.

He's essentially confessed to them in emails that "I'm the person making these threats." He comes in. He is *Mirandized*, waives that, and gives four hours of conversations with them, including identifying that he has firearms in his

home, the two firearms, which in the FBI agent's interview of his mother, you know, the timing of when those firearms were purchased, at least one was purchased in 2020 at the behest and request of his sister because of break-ins that were happening, for safety of the home, and Mr. Lidderdale had nothing that would prohibit him from having a firearm.

So there's no evidence before the Court that the purchasing of the holsters, the firearms, the lock -- when those were purchased or what those were intended for. There is the speculation.

THE COURT: There were two firearms.

MS. MacDONALD: There were two firearms, yes.

THE COURT: So why two? Why buy the second one?

MS. MacDONALD: I mean, Your Honor, people have multiple firearms for protection, not necessarily just one. He does not have those anymore.

Additionally, as we started this hearing with his mother, who had not been aware -- obviously, you know, having envelopes and paper and stamps isn't something that the average person is going to look and say, like, "Oh, that's evidence of a crime." There's nothing to kind of trigger you that something may be going on here.

The fact that there was a firearm in the home wasn't something to trigger that there could be concerns because, again, legally he could have a firearm, and the family had been

31

suggesting that he get one for the safety of the home and the family because of break-ins that had been happening during this kind of COVID pandemic timeframe when he received them.

He -- she is now fully aware of what he's been alleged to be engaged in. She has fully -- she has come to every single court hearing. She has heard everything that the government has provided at the detention hearings to the Court. She's heard from Judge Jolson. She's met with Pretrial Services.

She has told this Court or confirmed -- my representation to this Court -- that she is willing to keep an eye and make sure to report him doing anything that may not comply with those conditions. And she's retired. She lives home. At this point, she's there 24/7.

And the conditions that Judge Jolson considered are to be on GPS monitoring with home confinement but for going to --

THE COURT: You are not suggesting she is capable of physically restraining her son if he decides to go commit an act of violence, are you?

MS. MacDONALD: Your Honor, I'm saying that she --

THE COURT: I don't think she is.

MS. MacDONALD: She is willing to provide or contact law enforcement, his Pretrial Services officer, if she has any inclination that he is doing anything he is not supposed to do.

The Bail Reform Act does not require that we have

32

absolute guarantees.  It requires that the Court needs to release someone if there are any combination of conditions that could reasonably assure a person would not be a danger to anyone else, and I don't think anyone has argued here about flight risk.

Mr. Lidderdale is 39 years old.  He has lived in Ohio his entire life.  He has family here.  He has close ties with his sister and his mother.  He has a history of employment. He -- again, he -- eventually, he came forward to the FBI.

He didn't know if they were close to him or not.  As far as he knew, he had -- you know, no one knew what he was doing, but he reached out eventually to them.  He confessed.  He cooperated in that regards is what I was referring to.  He cooperated with Pretrial Services.  He cooperated with Dr. Veltri and her assessment.

He has in statements -- I think Judge -- Magistrate Judge Jolson, you know, characterized it as he has shown remorse and rehabilitation.  He has made statements --

THE COURT:  Where?

MS. MacDONALD:  He had --

THE COURT:  I have not seen any remorse expressed anywhere in any materials I have.

MS. MacDONALD:  He -- the fact that he came forward and confessed, also that he had made statements to Dr. Veltri that he never meant to actually -- to physically harm anyone.

33

She also in her reports --

THE COURT:  I haven't seen any statement that he never meant to harm anyone.

MS. MacDONALD:  It would be, Your Honor, in Dr. Veltri's report, which was filed under seal with Judge Jolson, and then in her recommendation or her order.

THE COURT:  Okay.  Well, I'm looking at the things that he said to the FBI and the things that he said in his communications to the --

MS. MacDONALD:  And, again --

THE COURT:  All right.  Go ahead.

MS. MacDONALD:  What I guess I want to make clear is we're not minimizing everything that he has said, but the question I think the --

THE COURT:  My question is:  Why can't we take him at his word?  He said he was going to kill these folks, and he went out and he had the facilities, the tools to do that.

MS. MacDONALD:  Well, then, Your Honor, the counter to that would be that he never did, that he came to the law enforcement and said, "I'm who you are looking for."

He never has -- there's never any evidence that he went to their employment or to their home or that he attempted to in any way harm anyone, that at most, they were -- they were harmed by the threats and the mental state that placed them in, but there's no evidence --

34

THE COURT: So we shouldn't believe what he said in the letters?

MS. MacDONALD: Your Honor, I'm saying that if you are looking at his own actions, I guess, his actions counter -- what he did after that counter what's said in those.

You can make threats all the time and not necessarily carry them out. The threats themselves are still a crime and still have damage, but just because --

THE COURT: So these -- these letters that contain the white substance, do you agree that those could be considered a physical attack?

MS. MacDONALD: Your Honor, again, they can definitely be a -- cause fear and they can be a criminal act, but the powder itself was not something that was poison.

THE COURT: People didn't know when they were exposed to it, did they? Not for a long time.

MS. MacDONALD: I -- I understand, Your Honor.

THE COURT: Yeah. And it was a physical substance, wasn't it?

MS. MacDONALD: Yes, Your Honor.

THE COURT: Which they were exposed to.

Okay. And so you wouldn't deny that they probably experienced some emotional harm as a result of that?

MS. MacDONALD: No, Your Honor. I'm not denying that.

THE COURT: All right.

MS. MacDONALD:  What I'm just suggesting to the Court is that the -- the question on whether or not an individual can be released goes far beyond just the crime he is being charged with and the allegations of what he did.  It goes beyond the impact it had on the victims.

It has to look at -- the presumption, the basis behind the Bail Reform Act is that detention is very narrow, a narrow thing that we would do with people that are pretrial, and you have to look at whether or not there are absolutely no conditions.  The conditions --

THE COURT:  So one of the things that concerned me was one of the statements made in the psychological evaluation, and that statement says:  "Violence risk assessment is beyond the scope of this assessment."  Namely, the psychologist's examination that we have in the file.

MS. MacDONALD:  She went further on that.

Your Honor, she was retained specifically to do a diagnostic assessment.

THE COURT:  And she could not assess the nature of the risk that he presently represents to others.

MS. MacDONALD:  She did not do a formal risk assessment.  I believe she did opine to some degree in that statement that he, to her, does not presently --

THE COURT:  Well, what I've read, I believe, is correct.  Tell me if I'm wrong.  "A violence risk assessment is

beyond the scope of this assessment."  Her report.

MS. MacDONALD:  Correct.  This was not a violence risk assessment.

THE COURT:  All right.

MS. MacDONALD:  She -- she had some opinions regarding his current state of a risk of violence.

THE COURT:  So we don't have any expert opinion in the record about his risk for violence.

MS. MacDONALD:  Your Honor, we do not have a formal violent risk assessment because that was not requested by the Court.  The Court requested a mental health diagnoses.

THE COURT:  All right.  Well, I can only work with what I have.

MS. MacDONALD:  Mental health treatment, I understand.

In her report, while it was not a formal -- she did not engage in a formal protracted risk assessment, she did, I think, add further that she did not believe or he did not appear to be a danger to himself or others.

Again, it's not a formal assessment.  It is, you know, her -- her belief, with the information she had in front of her, with the evaluation that she committed or that she conducted.

Your Honor, so regarding the -- and there were conditions of treatment that she had recommended, including the CBT, which would be available without --

THE COURT:  How do you treat someone for something that's not diagnosed?  What are they going to treat him for?

MS. MacDONALD:  Two things, Your Honor.

When a person is in treatment outside of the jail, there can be a much more thorough in-depth mental health assessment that can happen with the ongoing treatment and counseling that happens.

That report did not say that there wasn't anything to treat.  There is a history of family trauma.  There is depression.  There is stressors.  That there was a belief that treatment would be appropriate.

I would note that Pretrial Services didn't even recommend mental health treatment.  That was something that was requested as a condition.

THE COURT:  Well, depression would not ordinarily result in violence to someone, and I don't understand what they would treat him for.  They haven't diagnosed him with anything --

MS. MacDONALD:  Your Honor, I think that --

THE COURT:  -- other than the possible depression.

MS. MacDONALD:  Dr. -- well, in that --

THE COURT:  If he's just carried away with his anger, which he says over and over again that he is carried away with his anger, then how do you -- how do you treat that?

MS. MacDONALD:  We have anger treatment all the time,

Your Honor, and there is counseling that can be done to -- to help an individual figure out what their triggers are, how to address those triggers, how better to process their emotions, how better to process their -- how they interact with others and themselves.  There -- there is treatment that is available.  And while in a treatment facility, they can --

THE COURT:  Well, he hasn't had any such treatment.  That's for sure.

MS. MacDONALD:  He's had no treatment, Your Honor.  He's had no treatment at all.

THE COURT:  Oh, okay.  So that's part of the risk assessment.  He's had no treatment for anything.

All right.  Anything else?

MS. MacDONALD:  Yes, Your Honor.  I'm sorry.  If I could have a moment.

Regarding other characteristics, he's had -- as the Court said, he's had no mental health treatment before, so we don't have a record.  Clearly, this -- these allegations call out that there's a treatment of some sort needed.

Additionally, there is no prior criminal conviction or history, so there's no history of him not obeying any court's orders.

In this case, he -- the Court ordered that he get the evaluation.  He complied with that.  He's willing to do treatment.  He's willing to do the, essentially, home

confinement but for going to any obligations that this Court has imposed as part of a pretrial release.

THE COURT: So should the Court consider what impact releasing him to his mother is going to have on the victims in this case?

They now know that he not only made the threats, but he had the weapons to carry them out, and now he's on the street.

MS. MacDONALD: Your Honor, that was --

THE COURT: How do you think they are going to feel?

MS. MacDONALD: Oh, I'm sure they are going to feel scared, Your Honor, and not happy with him being released. But, again, that is only one of the things that the Court has to factor in.

He does not have any of the firearms or any of the means.

The conditions of release that are being -- were being imposed by Judge Jolson included GPS monitoring, which means that Pretrial -- it's actually active. Like, they can see online at any time where he's going.

THE COURT: So he can -- he can just rip that thing off, can't he, and go wherever he wants to if he wants to carry out his threats?

MS. MacDONALD: Again, Your Honor --

THE COURT: His mother can't restrain him, can she?

MS. MacDONALD: The Bail Reform Act doesn't require

40

that the Court has to find 100 percent guarantees.

The question is whether or not the government has proved by clear and convincing evidence that there is absolutely no combination of conditions to reasonably -- reasonably assure the safety of others. Having him on GPS monitoring, which has tracking live with Pretrial Services, having him under pretrial supervision, having Pretrial reporting weekly, if not more, if the Court requires it, to Magistrate Judge Jolson, having him on home confinement, having him in treatment, having him have no access, all of the electronics being removed from the home -- I believe there was one electronic that would be allowed for his mother through it being programmed so it's password-protected and he would have no access to that.

I've even had clients where the family will lock it up. They can put a padlock on their room and the object stays in there or stays with them.

There are things that Pretrial can do that he and his mother are willing to work with to make sure that any and every condition that could be imposed to assure the Court and, hopefully, the alleged victims, to know that he is locked down. He is -- just he's locked down at home, getting treatment, than locked down in custody where he won't get anything.

And, again, these charges, as serious as they are, are not ones that -- that presume that an individual should be locked up.

41

The cases that the government cited to aren't factually -- aren't -- all of the factors aren't exactly the same as Mr. Lidderdale.

In looking at some of those defendants, they had prior criminal history that was similar to the allegations in those cases, or they had been contacted by FBI and then continued to engage in -- contacted by law enforcement, continued to engage in the behavior before they were ultimately arrested.

One individual that was cited by the government, when I looked at the file, with the threats, it was, I think, a JAG officer that was threatening law enforcement and judges and various other public officials who is now on a pretrial diversion program with less conditions than, you know, we're proposing that Mr. Lidderdale be placed on.

So, while these allegations are very serious, they are only but one of the factors the Court has to weigh, and I know that -- I don't believe -- well, I don't believe that Magistrate Judge Jolson took her order in any way lightly. She had multiple hearings. She reviewed everything the government put forth regarding the seriousness and the danger of the --

THE COURT: I have the utmost respect for Magistrate Judge Jolson, but this is *de novo*. I'm not -- I'm not supposed to give any deference at all to what she did. I'm supposed to start from scratch and make the decision.

MS. MacDONALD: Then I would just argue for the Court

42

that those conditions -- that combination of conditions, so with having all of those conditions, with the reporting, with the monitoring, with the treatment, with the home confinement, with the GPS, all of those are conditions that would reasonably assure the Court that he would not be a danger to the victims in this case or to anyone in the community.

I would also note for the Court that we did not object to a protection -- protective order in this case. The government proposed one, so that way they could determine what is highly sensitive that Mr. Lidderdale should never have but for in my presence.

We've agreed and signed off on that.

So they control, you know, exactly how and what he will be able to see based on how they specified the discovery that they provide to us.

So information regarding the threats to the victims, their locations, all of that, I'm guessing, is going to be sent to me or was sent to me with "highly sensitive" -- where he will never have copies of this.

He will have no computers or electronics in his home. He will be bound to his home.

It would make it very difficult for him to be able to continue on in sending letters or finding stuff with all of those conditions in place that -- somewhere someone, it's going to trigger some sort of notice to Pretrial.

So, Your Honor, we would ask the Court, given all the information in front of the Court, understanding the severity of these allegations, but also all of the four factors the Court has to balance out, including his -- his characteristics, that there are conditions that would, again, reasonably assure.

The Court is not required to find by a hundred percent an absolute guarantee. The question is whether it can reasonably assure, and all of the conditions that are being recommended in this case we would endorse in the previous order and ask this Court to impose those conditions and any other the Court could consider -- although we may have covered everything that's available, but to impose those conditions and to release him.

THE COURT: Thank you, Ms. MacDonald, for your usual fine job on behalf of your client.

MS. MacDONALD: Thank you, Your Honor.

THE COURT: Mr. Martinez, anything further?

MR. MARTINEZ: Unless the Court has further questions of the government, Your Honor, we have nothing further.

THE COURT: All right. Well, this is a difficult case, and I have a lot of material to review.

I'm going to order today that the order of release is set aside and that I will take it under *de novo* review and render a final decision on the issues that we've heard here today just as soon as possible.

44

And counsel for both sides, thank you for your professionalism and for the materials and the information you've provided to the Court here today.

So that will be the Court's order today.

We're going to continue Mr. Lidderdale in custody until the Court has made a final decision on whether he can be released on bond.

And with that, Ms. Cook, you may adjourn court.

DEPUTY CLERK:  All rise.

(The proceedings were adjourned at 2:33 p.m.)

- - -


C E R T I F I C A T E


I, Allison A. Kimmel, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable James L. Graham, Senior Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


s/Allison A. Kimmel
Allison A. Kimmel, FAPR, RDR, CRR, CRC
Official Federal Court Reporter
 July 17, 2025