**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| United States of America, | : | |
| | : | **Case No. 2:25-mj-00270** |
| Plaintiff, | : | |
| v. | : | **Judge Graham** |
| | : | |
| Ronald E. Lidderdale, | : | **Magistrate Judge Jolson** |
| | : | |
| Defendant. | : | |

## <u>OPINION & ORDER</u>

This matter is before the Court upon the Government's motion to revoke the Magistrate

Judge's pretrial release order. Doc. 36; doc. 30. For the reasons that follow, the Court **GRANTS**

the Government's motion and **ORDERS** that Defendant Ronald E. Lidderdale be detained pending

trial, or further order of the Court.

## DISCUSSION

Defendant Ronald E. Lidderdale was arrested on May 8, 2025. Doc. 20. The Court set a

detention hearing for May 14, 2025, and ordered the temporary detention of Lidderdale pending

the hearing. Doc. 7; doc. 12. Following the May 14 detention hearing, the Magistrate Judge ordered

a mental health assessment and remanded Lidderdale to the custody of the US Marshals pending

further updates. Doc. 16. A second hearing was held on July 7, 2025, whereupon the Magistrate

Judge ordered that Lidderdale be released with certain conditions, but with said release stayed until

July 16. Doc. 29. An opinion followed in which the Magistrate Judge explained her consideration

of the factors under 18 U.S.C. § 3142(g). Doc. 34.

The government filed a motion to revoke the pretrial release order pursuant to 18 U.S.C. §

3145. Doc. 36. The Court held a hearing on the government's motion on July 16, 2025, and ordered

[1]

that Lidderdale remain detained pending the Court's decision on the same. Doc. 41. The government's motion is now ripe and fully briefed.

The custodial status of a pretrial criminal defendant is governed by 18 U.S.C. § 3142, which provides that such person shall be detained upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Court is directed to consider four (4) factors in making this determination:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including--
>   (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>   (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release…

18 U.S.C. § 3142(g).

When a magistrate judge orders a person released under that statute, the government may seek revocation of the release order in the court having original jurisdiction over the offense, pursuant to 18 USC. § 3145. Such a motion shall be determined "promptly" upon *de novo* review of the record. *United States v. Zapien*, No. 3:14-CR-00037-1, 2014 WL 1028435, at *2 (M.D. Tenn. Mar. 17, 2014) (citing *United States v. Stokes*, 2006 WL 3843589, at *1 (M.D.Tenn. Dec.22, 2006)). The government must show risk of flight by a preponderance of the evidence but must

[2]

persuade the court of the defendant's dangerousness by clear and convincing evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

## I.        Consideration of 18 U.S.C. 3142(g) Factors

The evidence presented by the government paints a clear and convincing portrait of Lidderdale as a dangerous man. *See* Docs. 16-1 – 16-12. The brushstrokes are chilling. With postage supplies and email addresses as his primary instruments, Lidderdale waged a campaign of terror and intimidation against dozens of public officials, from the comfortable seclusion of his bedroom in his mother's house.[1] For 10 months, he escalated threats against those who make our government function, and for 10 months, he actively eluded detection, despite an ongoing investigation into his actions. His campaign ended only when he contacted the FBI, for reasons that are unclear. He claimed he did so not because he was ready to stop but because he was afraid he would continue. As the undersigned indicated at the hearing on this motion, the Court is inclined to take Lidderdale at his word—that he did intend to carry out his threats.

### A.        The Nature and Circumstances of the Offense Charged

This factor directs the Court to consider the offense conduct, "including whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1). A crime of violence is defined as "an offense that has as an element of the offense the use, attempted use, or **threatened use** of physical force against the person or property of another." 18 U.S.C. § 3156(a)(4)(A) (emphasis supplied).

"We are in the final week of your life on this earth. I am coming to shoot you dead." Doc. 16-7. This is a representative example of the messages Lidderdale sent to his targets, conduct which plainly meets the statutory definition of a crime of violence. The Magistrate Judge

---

[1] Pursuant to the posture of this motion, the Court's factual findings here are qualified as tentative, based on what evidence has been presented. This footnote is intended to stand in lieu of filling up this opinion with qualifiers like "allegedly" and "the evidence shows…"

concluded that this factor favors detention but also noted that Lidderdale's conduct never crossed the line into physical violence or in-person conduct, and that "the Government presented no evidence suggesting that Lidderdale had concrete plans" to act on his threats. Doc. 34, # 124. The Court disagrees. Possession of the instruments necessary to carry out his threats is significant credible evidence of his intent to carry out his threats. At the time of his arrest, Lidderdale was in possession of 2 semiautomatic 9mm pistols, 99 rounds of ammunition and tactical gear, including gloves, a lock-picking kit, and a drop holster (described as "a certain kind of holster which is typically worn to go along with body armor… because it's easier to draw." (doc. 42, # 197)).

Lidderdale was not coy about his intentions. They were announced to his victims with terrifying specificity ("I will see you bleed next month" (doc. 16-9)). He used false return addresses on his mailed threats, making it seems as if the letters were sent by "individuals who were either currently or previously employed by the targeted government official." Doc. 1-1, # 4. He wore gloves while preparing his mailings and sent them from different post offices to cover his tracks. Doc. 42, # 193. He used at least seven separate Proton email accounts—a Swiss, encrypted email service which can be difficult or impossible to trace—to send his threats. Doc. 1-1, # 4. He used virtual private networks (VPNs) to conceal his online activity. Doc. 42, # 194. From behind his carefully constructed veil of anonymity, Lidderdale made sure his victims knew that *he knew* where they lived, where they worked, and information about their families. The Court recognizes the important distinction between threats and actual physical violence; but the Court believes that threats accompanied by actual *plans* for physical violence should be considered much more serious than mere threats alone. Most importantly, the Court is without any reason to dismiss Lidderdale's plans as illusory. Lidderdale contacted the FBI—ultimately leading to his arrest—claiming he did not want to reach the point of no return where, in his words, "the urge finally breaks me and I act."

[4]

Doc. 16-12, # 114. It's clear that Lidderdale himself believed his threats reflected an intent to act. His victims likely believed the same, and they now know that Lidderdale possessed guns, ammunition, and tactical gear. Doc. 16-10, # 87. Though the Magistrate Judge noted that Lidderdale's anonymity caused substantial anxiety for his victims (doc. 34, # 125), the Court is not persuaded that his unmasking has a mitigating effect on his future dangerousness, or the fear that his release would likely inflict on his victims. Knowledge of Lidderdale's identity would be cold comfort to one of his victims in the event of his release.

Now more than ever, the Court must take seriously Lidderdale's statements, and his concerns about the same. The targeting of public officials has become a virulent issue which must be universally condemned. Since Lidderdale's arrest, a Minnesota state lawmaker and her husband were killed by a man impersonating a police officer.[2] That same man had already shot another state lawmaker and his wife, leaving them critically wounded, and had stopped at two other lawmakers' residences, where he was foiled by chance.[3] The alleged suspect was only found after nearly two days of searching, and reports described a "hit list" he possessed with approximately 70 names on it.[4]

Last year, during his candidacy, President Trump was targeted by two assassination attempts, one of which missed by mere centimeters and left a bystander dead.[5] In 2022, an assassination attempt against Supreme Court Justice Brett Kavanaugh was planned (and later

---

[2] Isabelle Chapman, et al., *What We Know About the Minnesota Shooting Suspect*, CNN (Jun. 16, 2025 at 4:29 ET), https://www.cnn.com/2025/06/14/us/minnesota-shootings-manhunt-vance-boelter-invs.
[3] *Id.*
[4] *Id.*
[5] Andy Sullivan, et al., *New Apparent Trump Assassination Attempt Highlights Secret Service Strains*, Reuters (Sept. 17, 2024 at 18:39 ET), https://www.reuters.com/world/us/new-apparent-trump-assassination-attempt-highlights-secret-service-strains-2024-09-17/.

abandoned) by the perpetrator based on his disagreement with an anticipated SCOTUS decision.[6] Later that year, a man broke into Congresswoman Nancy Pelosi's personal residence with the intent to kidnap her, and assaulted her husband with a hammer, fracturing his skull.[7] In 2020, District Court Judge Esther Salas was targeted by an assailant—an attorney who had appeared before her—who shot and killed her adult son, Daniel, and wounded her husband.[8] Later, those seeking to intimidate judges sent pizza deliveries to their home addresses in Daniel's name.[9] In 2017, a man opened fire at a Congressional Baseball practice, seriously wounding Representative Steve Scalise and three others.[10]

This macabre phenomenon—the use of violence, in lieu of democratic processes, toward political ends—is not limited to holders of public office. In December of last year, Luigi Mangione shot and killed a father of two outside a hotel in New York because he was also the CEO of UnitedHealth[11]—an event which Lidderdale referenced in his threats, describing it as a "social justice execution." Doc. 1-1, # 16. In May, a man shot and killed a young couple while they were leaving an event in Washington D.C., because they worked for the Israeli embassy.[12] The violent

---

[6] Lawrence Hurley, *Man Charged with Attempted Murder of U.S. Supreme Court Justice Kavanaugh*, Reuters (Jun. 8, 2022 at 19:44 ET), https://www.reuters.com/world/us/armed-man-arrested-near-home-us-supreme-court-justice-kavanaugh-2022-06-08/.

[7] Paresh Dave & Steve Gorman, *Paul Pelosi Attack Suspect Sought to Take Speaker Hostage, Prosecutors Say*, Reuters (Nov. 1 at 2022 2:58 ET), https://www.reuters.com/world/us/suspect-attack-house-speaker-pelosis-husband-expected-be-formally-charged-2022-10-31/.

[8] Esther Salas & Robin Rosenberg, *In Daniel's Name*, 107 Judicature 8, 9 (2023)

[9] Brenda Flanagan, *Pizzas Sent as Threats in Name of Judge's Murdered Son*, NJ Spotlight News (April 16, 2025) https://www.njspotlightnews.org/video/pizzas-sent-as-threats-in-name-of-judges-murdered-son/.

[10] Sarah N. Lynch & Ross Colvin, *Gunfire Turns U.S. Lawmakers' Baseball Practice into 'Killing Field'*, Reuters (Jun. 14, 2017 at 19:41 ET), https://www.reuters.com/article/world/us/gunfire-turns-us-lawmakers-baseball-practice-into-killing-field-idUSKBN1953AL/.

[11] *UnitedHealth Executive Brian Thompson's Murder: What's Known About the Suspect?*, Reuters (Dec. 9, 2024, at 12:00 ET), https://www.reuters.com/world/us/what-is-known-about-shooting-unitedhealth-executive-brian-thompson-2024-12-05/

[12] Jasper Ward & Emily Rose, *Suspect Charged with Murder in Fatal DC Shooting of Two Israel Embassy Aides*, Reuters (May 22, 2025, 19:54 ET), https://www.reuters.com/world/middle-east/two-israeli-embassy-staffers-killed-washington-shooting-2025-05-22/

riots alongside the George Floyd protests, the January 6 U.S. Capitol attack, and the recent attacks on ICE officers are different strains of the same virus.

Exacerbating the problem is the now-common lionization of such violence. Research has shown that "the more public support there is for political violence, the more common it is."[13]. And, according to Robert Pape, a professor of political science at the University of Chicago, public support for political violence is rising on both the right and the left.[14] Mangione has been glorified as a hero for shooting a CEO in the back as he left his hotel.[15] Following the spree of violence in Minnesota, while the suspect was still at large, Senator Mike Lee of Utah tweeted pictures of the shooter, saying, "this is what happens when Marxists don't get their way," and "Nightmare on Waltz Street" (the latter in reference to Minnesota Governor Tim Walz).[16] Reactions like these give assailants the attention they crave, and inspiration to those that would follow in their footsteps. But the foundation for such violence and rhetoric comes from the ubiquitous, reflexive demonization of anybody with opposing views.

In sum, the nature and circumstances of the offense are the latest example of a blight on our legal and political systems. To be clear, the Court's decision here is not based on the actions of other, unrelated individuals. Rather, the record before the Court provides abundant grounds to conclude that Lidderdale must be detained pending trial. Lidderdale wrote to his victims in graphic detail about his violent intentions. The threats in those communications—in conjunction with the circumstances of sender's anonymity and apparent knowledge of the victim's home address—are independently harmful for the emotional injury inflicted on the victims (and, as the government

---

[13] Robert A. Pape, *We May Be on the Brink of an Extremely Violent Era in American Politics*, N.Y. Times (June 16, 2025), https://www.nytimes.com/2025/06/16/opinion/political-violence-minnesota.html.
[14] *Id.*
[15] *Id.*
[16] *Id.*

[7]

notes, the resources expended in response to the threats, including the police response, HAZMAT response, and the need to invest in greater security measures). *See* doc. 36, # 146. Lidderdale went even further by including a white substance and claiming it to be a lethal poison, and by mailing a bullet with the intended recipient's name etched into it. Not only did these actions escalate his threats—and the harm they caused—but they further evinced his intent to act on his threats. Doc. 16-10, # 87. Given the real, lasting harm inflicted by Lidderdale for months without detection, such conduct should be subject to a rebuttable presumption of detention. *See* 18 U.S.C. § 3142(e)(3) (listing offenses for which a rebuttable presumption of detention arises upon a finding of probable cause). Regardless, this factor weighs in favor of detention.

### B. The Weight of the Evidence Against the Person

When assessing this factor, the Court is directed to consider "the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). Regardless, the Court agrees with the government that, in this case, this factor overlaps substantially with the first. The record is replete with Lidderdale's own statements as to his dangerousness. *See, e.g.*, doc. 16-6 ("I will take great pleasure when the time comes to kill you."); doc. 16-7 ("We are in the final week of your life on this earth. I am coming to shoot you dead.") doc. 16-9 ("I will kill all of you on my list… Blood will flow from each of my bullets. I am coming. I am coming to kill all of you.").

As the Court noted above, Lidderdale himself contacted the FBI using an electronic tip portal. He did not identify himself, but referred to himself as "Fred." He referred to his "threats" and "warnings" to certain Ohio politicians, saying "my urge to act has hit a boiling point," and "I want to kill those involved but my morals keep dragging me back." Doc. 16-11, # 111. An FBI agent skillfully manipulated him into appearing for a personal meeting where he was arrested. In

[8]

sum, the weight of the evidence of Lidderdale's dangerousness, much of it from Lidderdale's own statements, weighs heavily in favor of detention.

### C. The History and Characteristics of the Person

Lidderdale has no criminal history. He has lived in Ohio all his life and has strong familial relationships. But Lidderdale's benign history is not enough to overcome the nature and seriousness of the offense conduct, and the threat of harm his release would pose to his victims and the public.

### D. The Nature and Seriousness of the Danger to any Person or the Community

The Court finds that no combination of conditions would reasonably protect the public pending Lidderdale's trial. In his response to the government's motion, Lidderdale points out that the government has confiscated all the electronics and materials he allegedly used in the commission of the offense. Doc. 40, # 177. Furthermore, he notes that his mother, Ms. Adams, is "now aware of the alleged conduct in this case" and she "is amendable to acting as a third-party custodian and working with pretrial services, including the restriction of any and all electronics in the home." *Id.*

But, as the government points out, this would return Lidderdale to the same circumstances under which he is alleged to have committed the offense conduct, less some mailing supplies, electronics, and his guns and tactical gear—all of which can be easily replaced. The Court is not reasonably assured of the public's safety with his mother as his "third-party"[17] custodian. In the event that Lidderdale's "urge to act hits a boiling point," as he feared, the Court is not persuaded that Ms. Adams—his cohabitant while he waged his harassment campaign—would be a

---

[17] "Third-party" usually suggests a level of disinterestedness that is plainly inapplicable to the role of the mother-gaoler.

[9]

meaningful deterrent. Again, the Court agrees with the government that "any future violation… would not be detected until it's too late." Doc. 36, # 153.

Lidderdale used extraordinary and sophisticated means to conceal his identity. He had no reason to doubt he had been successful—both in intimidating his victims and in covering his tracks—and likely believed that, if he could convince the government that he had a mental illness and was about to lose control of his irrepressible murderous ideations, they might be willing to make substantial concessions to find out who he really was. Lidderdale would appear to have good reasons to seek such concessions, as the offenses alleged in the criminal complaint carry the potential for significant sentencing penalties.[18]

Lidderdale's statements to the FBI are either a very cleverly crafted scenario intended to deceive them into treating him more favorably, and thus reduce the consequences of his criminal behavior, or they are the truthful confessions of a paranoid psychopath who requires mental health treatment in a secure facility. In either event, he is a clear and present danger to the public and should not be released. As such, the Court finds that pretrial detention is warranted for Lidderdale.

## CONCLUSION

Having considered the arguments of the parties and evidence presented, the Court finds that no combination of conditions will reasonably assure the safety of the community in the event of Defendant Ronald Lidderdale's release. As such, the Court **GRANTS** the motion of the government and hereby **REVOKES** the order of pretrial release. Pursuant to 18 U.S.C. § 3142(i),

---

[18] The criminal complaint alleges violations of (1) 18 U.S.C. § 875 (c) – Interstate communications with a threat to kidnap or injure (up to five years imprisonment); (2) 18 U.S.C. § 876 – Mailing threatening communications (up to five years; up to ten years if victim is a government employee covered by the statute); (3) 18 U.S.C. § 1038 (a)(1) – False information and hoaxes (up to five years) (4) 18 U.S.C. § 2261A(2) – Cyberstalking (up to five years). Lidderdale has not yet been formally indicted, but, given his wide-ranging admissions to law enforcement, the specter of his potential penalties may grow to include numerous counts of the identified offenses.

[11]

the Court **DIRECTS** that Defendant Lidderdale be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; that Defendant Lidderdale be afforded a reasonable opportunity for private consultation with counsel; and that, on order of a court of the United States or on request of an attorney for the Government, Defendant Lidderdale be delivered to a United States marshal for the purpose of an appearance in connection with a court proceeding.

     **IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: August 18, 2025

[11]