UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

UNITED STATES OF AMERICA,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　PLAINTIFF,　　　　　　　　　　　　) CASE NO. 2:25-mj-270
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
RONALD LIDDERDALE,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　DEFENDANT.　　　　　　　　　　　　　)
_____　　　　　　 )


　　TRANSCRIPT OF AUDIO-RECORDED DETENTION HEARING PROCEEDINGS
　　　　BEFORE THE KIMBERLY A. JOLSON, MAGISTRATE JUDGE
　　　　　　　WEDNESDAY, MAY 14, 2025; 10:59 A.M.
　　　　　　　　　　　COLUMBUS, OHIO

　　FOR THE PLAINTIFF:
　　　　　Dominick S. Gerace II
　　　　　United States Attorney
　　　　　By:　Brian Martinez
　　　　　　　 Damoun Delaviz
　　　　　Assistant United States Attorney
　　　　　303 Marconi Boulevard, 2nd Floor
　　　　　Columbus, Ohio 43215

　　FOR THE DEFENDANT:
　　　　　Federal Public Defender's Office
　　　　　By:　Stacey L. MacDonald, Esq.
　　　　　10 West Broad Street, Suite 1020
　　　　　Columbus, Ohio 43215

　　　　　　　　　　　　　　- - -

　　Proceedings audio-recorded by CourtSmart, transcribed using

mechanical stenography, transcript produced by computer.

2

Wednesday Morning Session

May 14, 2025

- - -

(The following proceeding was held in open court.)

DEPUTY CLERK: Please rise. The Honorable Kimberly A. Jolson, United States Magistrate Judge for the Southern District of Ohio.

Please be seated.

Case number 2:25-mj-270, the United States v. Ronald E. Lidderdale.

THE COURT: Good morning. I'm pleased to recognize Mr. Martinez and Mr. Delaviz on behalf of the United States, and I'm also pleased to recognize Ms. MacDonald on behalf of Mr. Lidderdale.

This matter comes before the Court on the government's request to detain the defendant pending trial of this case.

In considering this request, I'm guided by several general principles. First, Mr. Lidderdale enjoys the presumption of innocence.

Nothing that I say during this hearing or that I set forth in my findings is intended to affect that presumption.

Additionally, under the Bail Reform Act, pretrial detention is an exceptional step.

Release is required unless and until a judicial officer finds that there is no condition or set of conditions that can

provide two reasonable assurances:  The assurance that the community stays safe and the assurance the defendant appears in court as required.

Additionally, the Act requires that the least restrictive conditions be imposed to provide those reasonable assurances.  If, however, no conditions can be fashioned to provide those assurances, release -- detention is then required.

I, of course, have in front of me the Pretrial Services report and the criminal complaint in this case.

I also have the exhibits that were offered to the Court and opposing counsel before the hearing today.

I want to focus on the record, and then I will give each side an opportunity to argue.

Are you going to be proceeding on behalf of the United States, Mr. Martinez?

MR. MARTINEZ:  It's going to be Mr. Delaviz, Your Honor.

THE COURT:  Okay.  Okay.  I wasn't sure because of how you were sitting.

All right.  Mr. Delaviz, for the record, anything else here today?

MR. DELAVIZ:  Yes.  I --

THE COURT:  Okay.

MR. DELAVIZ:  The government would like to proffer

additional facts.

THE COURT: Okay. Can you please take the podium?

MR. DELAVIZ: Thank you, Your Honor.

Your Honor, in addition, I'll -- to proffer the additional facts, I would move through the exhibits, but as Your Honor is aware, and as the complaint sets forth, this case results from an approximately (indiscernible) month investigation by the FBI and other law enforcement entities, and it resulted in Mr. Lidderdale's arrest last week.

Using the exhibits, Your Honor, I would first move to exhibit -- the 100 series, which is first 101.

101 demonstrates just a list of letters. The dates that were sent. The letters contain threats.

As Your Honor can see, they occurred in July and August of 2024. There are multiple dates in July and one date in August.

As is reflected, as the investigation revealed, these letters included -- were sent to multiple members of Ohio's Congress.

The return addressers -- the return addresses in no case during this investigation was this defendant.

For many of these letters, the return addressees were individuals who were on the staff of the recipient of the persons, and this defendant used addresses for those staffers.

The next exhibit, Your Honor, is 102.

After the letters were sent, the threats were moved from letters to Proton Mail.

As Your Honor might be aware, Proton Mail is a very private email service that's publicly available to users. It's based out of Switzerland.

Obtaining legal process is very difficult, and Proton Mail is popular for many individuals because of the anonymity that it provides.  And the use of Proton Mail in this case made identification of Mr. Lidderdale exceptionally difficult.

Again, these emails were sent over many days in September.  They were sent to many recipients.

Again, at no time did this defendant use his name.

The defendant used multiple Proton Mails, not just one, I believe.  There was seven Proton Mails -- emails used.

The recipients again -- again varied, but it included Ohio public officials as well as individuals, entities, news entities in Ohio.

Your Honor, the last one on that Proton Mail list, the 9/16, was not an email but a web submission wherein a Proton Mail was identified as the sender.

Moving to Exhibit 103, Your Honor, this is a three-page exhibit, again, which demonstrates to the Court the litany of activity that this defendant engaged in.

Again, multiple days, starting from November of 2024 to February of 2025.  These letters were all not emails, but

letters.

With the letters were -- within the letters were threats.  But then in this case each of these letters -- so each row -- represents a single transmission, as each row represented a single transmission in the prior exhibits.  But with each threatening letter in this case, there was white powder that was sent.

In many of the letters, as the complaint indicates, one of the -- a few of the letters are -- included in the complaint indicated that the substance, the white powder in the envelope, was ricin or something dangerous, that it explicit -- that for many of the letters, explicitly said ricin.

Many of the complainants, or the people who received the letters, indicated that they were terrified based just on the use of white powder letters in our community over the past two decades, perhaps since 9/11.

I would note for Your Honor many of these letters were -- in this case, so for white powder, they are addressed not only to the politician's offices or the public official's offices, but also to their homes in some instances.

Multiple letters were addressed to their homes, including the white powder letters, and then the addressee on the envelope was not only the public official or the politician, but in many instances this defendant would put the name of the spouse, by name, name the spouse, John and

Jane Doe, on the envelope.

In the 200 series, I'll talk about some of the letters, and some of the spouses are explicitly mentioned. Again, the return addressees here varied again. In no instance did this defendant use his own name or address.

Going to the 400 series, this is more recent, Your Honor. In April of this year, it started with this defendant mailing, again, a letter, a hard copy. It included a bullet, a hard -- a physical bullet -- and on the bullet was inscribed the last name of one of the political officials.

That followed with portal submissions. Your Honor, that's basically this defendant going on websites that -- for public officials and using what I would call the "contact us" option on those websites, and submitting the threats that way.

Oftentimes -- again, Proton Mails were used through those threats. There were two predominant Proton Mails that were used for these submissions in April of this year.

At the bottom of the list, Your Honor, there's a list of about eight physical submissions. Those eight physical submissions, I'll -- as I'll detail with the 200 series of exhibits, contained what I would call a kill list, indicating eight individuals that he indicated that he would be killing soon.

Moving to the 200 series of exhibits, Your Honor. Again, as Your Honor can see, that list demonstrates dozens of

transmissions.

And, of course, I don't think the Court wants to hear about all the transmissions, but many of them were similar in nature. Many of them are contained in the affidavit.

I would point out two Proton Mails -- if I can just read for the Court. One was sent on September 10th. This is Exhibit 201. September 10th, two oh -- 2024, at 9:37 p.m. It was sent to an Ohio public official. The name has been redacted.

And then I'll read it -- for delivery to redacted: "You simply cannot get over yourself. You are beginning to show more of your true Fascist, xenophobic, and racist self. I will take great pleasure when the time comes to kill you. I will be there in your weakened state after the poison begins moving through your body. Only then will I shoot you through your malformed crooked eyes. I expect the back of your head to explode out, possibly over your wife. Her extreme panic from the blood and brains will be fitting for someone who has seemingly sold her soul to live the hateful and deplorable lifestyle of your Republican party.

"Be careful what you do after reading this. For if you continue to be the sociopathic person you are, I will have no other option but to put down" -- "also put down your wife.

"I am coming. I will kill you."

Then it is signed: "Anonymousbelarusone."

The next exhibit in this series is another example of a Proton Mail that was sent.  This is Exhibit 202.

The subject is:  "Final week, I am coming for you," exclamation point.

The email reads:  "We are in the final week of your life on this earth.  I am coming to shoot you dead.  To see your blood and brains sprayed out.  To see that sadistic evil fucking crooked face of yours fall silent.  To finally witness that hollow soul leave your garbage of a body, you unholy fucking lapdog to Trump.  I am coming.  You will never see it coming.  I am coming."

Exhibit 203 is what I would term the bullet letter, Your Honor.  This is the letter that was transmitted to an Ohio public official.  It's a shorter letter.

But on the second page of Exhibit 203 is the bullet that was in that transmission that was sent via the United States Postal Service.

The name on the bullet has been redacted to protect the privacy of the victim, and it says "A" -- to that public official:  "A souvenir of what will come to pass.  Appreciate the meaning while you can.  For soon you will experience the ultimate gift of death by my hand."  Smiley face.

I would note that many of the transmissions in this case, that one, for example, and others, included smiley faces at the end of the transmissions.

Exhibit 204, Your Honor, is the letter that accompanied the kill list that was sent a few weeks ago at the end of August of -- I mean, April of 2025 to about eight recipients.

Your Honor, this is longer. If Your Honor would like, I'll read to you --

THE COURT: I've already read -- I've read all of these.

MR. DELAVIZ: I'll refrain from reading it.

I'll just highlight for the Court one white -- at least one white powder letter, when it was received at the home, the family of the public official was home, including young children. The family had to evacuate. A massive law enforcement presence responded.

Some law -- some of the white powder -- many of the white powder letters were opened by staff. Staff had to take days off. As a result, they thought about leaving their jobs.

At least one staffer developed hives out of the stress of receiving the letter. At least two recipients or -- at least one recipient began carrying a firearm as a -- as a result of receiving this letter, or one of these letters.

Your Honor, I would next move to the 300 series of exhibits. The 300 series of exhibits, I'll move through quickly.

These are pictures of items that were recovered at this defendant's home in New Albany, the home that he wants to be

11

released to, where -- where the search warrant was executed at his house last week.

Moving quickly, multiple computers were recovered, including a -- a computer that we believe was one he used to write the letters.

The second page contains about six credit cards. I note the name on this credit card is the defendant's mother.

When this defendant was arrested, he provided a statement after receiving the *Miranda* warnings.

In his statement, he admitted to using not only his own credit card but his mother's credit card to purchase some of the supplies that he used to commit these crimes.

The next page, Your Honor, are then -- after the credit cards -- is a box of ammunition. There was ammunition both found in the garage and in his bedroom.

There is also a scale that was recovered. In his statement, he indicated he used a scale to weigh the envelopes, a kitchen scale to weigh the envelopes, to know how much postage approximately to put on.

Then there's a picture of gloves. In his statement, he indicated he used gloves to prepare the envelopes, the physical mailings, to make sure he was as anonymous as possible.

He also indicated he had two firearms in his home. Two firearms were recovered from his home. One was a Glock. One is a Sig Sauer. They look similar, but they are different

12

firearms.

THE COURT: Mr. Lidderdale told law enforcement where the firearms were in the home?

MR. DELAVIZ: Yes. Yes.

THE COURT: Okay.

MR. DELAVIZ: Also recovered in his bedroom, Your Honor, was a series of -- of clothing from manufacturer 5.11, or 5.11.

There were receipts for the gloves that is depicted in one of the pictures. The -- it looks like the tags of the gloves are still on the item. The receipts are dated May 5th of this year, April 22nd of this year, April 19th of this year.

Many of the items are associated with this tactical gear. One of the pictures are -- are pants that appear to be still in a plastic wrapper, tactical gear.

There is also two pictures of a kit that is a lock-picking kit. There is a distant picture and a closer picture where there appear to be two or three locks and then equipment to open or pick a lock.

After the picture of the pants is two pictures, a distant picture and a closer picture, of a box of ammunition that was in a drawer in the bedroom.

The next picture is of another computer that was found in the house.

The following picture is of about eight cards: One

identification card and eight -- seven bank cards and debit cards in Mr. Lidderdale's name, in contrast to the earlier credit cards which were in his mother's name.

Also recovered in the house was a printer.  He indicated he printed the letters that he sent at his home.  On top of -- so the printer was found in the home.

On top of the printer is a gun holster.  It's a drop holster.

My understanding is a drop holster is particularly useful if you are wearing body armor so that there is easier access to a firearm without having to shift your body.

In addition, in the home was manila envelopes that are depicted in the next picture that are on the floor in front of the open cabinet.

There is also mailing envelopes.  Both manila and regular mailing envelopes were found -- used during the course of this crime.

Multiple cell phones were recovered in the house. There are pictures of a cell phone here, and I believe there's another iPhone depicted elsewhere.

There is also a glue stick.  Mr. Lidderdale indicated in his statement that he used a glue stick to close many of the envelopes that were not self-adhesive, and so a glue stick was found.

Gloves were found in the home, but he indicated at times

14

simply he used winter gloves but also latex gloves. A box of gloves was found in the closet. Some shoes.

The next picture, Your Honor, in his statement to law enforcement, he indicated that financial hardship was part of the reason that he committed these crimes.

He lost his -- he was employed at Macy's for many years, eventually as a manager, and then fired in December of 2024, and then hired by another furniture company in the Easton area in this year, 2025.

Among the documents that were found in the home are documents relating to him being fired from Macy's.

He was fired from Macy's because apparently he stole from Macy's. The document depicts his statement as to the theft, and I'll read -- it's difficult to read, so I transcribed it.

This is the second page that I'm reading from of the three pages in this exhibit.

And it says -- and it's relating to events on December 1st of 2024. "At 3:35 p.m., I told" -- and Holden Snyder, who is an asset protection manager -- "I told Holden Snyder that starting in March of 2024 I have been processing fraudulent delivery fee returns at the register. I returned these delivery fees to six different accounts, including to a debit card that belonged to my mother, Melanie Adams, and credit cards that belonged to my mother. I would then use

these cards to pay bills. I told Holden that I did this due to financial hardship."

Then the document lists about, what I counted to be, 22 transactions from March of 2024 to, I believe, November of 2024.

The total of the transactions is totaled in the letter as $6,900, a little more than $6,900. Also found was a promissory note wherein Mr. -- I believe Mr. Lidderdale agreed to pay back Macy's. I don't know if Macy's was paid back.

Also found in the house was stamps. Stamps were obviously used to mail many of the letters. There was also an additional iPhone found.

Many of the physical mailings in this case had labels affixed on the front, non-handwritten, but printed, and the corresponding or similar blank labels are found in the house. That's depicted in one picture.

The last picture is a laptop. And then the final picture is, while the ammunition that was recovered from the house was being processed by the FBI, they discovered that on one of the rounds of ammunition the name of the politician who had received the bullet mail was also faintly inscribed on another piece of ammunition that was still in the house.

Agents aren't sure exactly why that was still in the house. Perhaps it was a practice bullet that he wasn't

16

satisfied with the etching, but another bullet with the same politician's name was found in the house.

That's the 300 series of exhibits, Your Honor. I'll move now to the 400 series of exhibits.

The 400 series of exhibits represents this defendant's communications with FBI in the days leading up to his arrest.

He reached out to FBI via the tipline. That led to his arrest. I won't go through all the emails. I'll just go through two of them.

I'll -- first 401, Your Honor, is the tip that he submitted on May 1st of 2025 or May 2nd of 2025.

I'll highlight for the Court: "What crime are you reporting? Mail threats in Ohio. Warnings for those. How do you know this individual? I am the individual."

And then I won't read the submitted text. Your Honor has it before her, but I'll highlight for the Court: "My urge to act has come to a boiling point. I believe that by removing those parasites will bring a renewed peace to all of Ohio. This is a fair warning that my urge will break my patience. I want to kill those involved, but my morals keep dragging me back."

Moving to Exhibit 402, as a result of that transmission, 401, the FBI engaged in an email back-and-forth with this defendant.

He was using a Proton Mail different than the Proton

Mail that he used earlier in the investigation.

The communications occurred, I have described, over the course of approximately one week.

This -- 402 is, I believe, the second transmission he sent to FBI after -- 401 being the first.

He said: "I was never" -- again, I won't read the whole thing, but I'll highlight for the Court. "I was" -- "I was" -- "was never a violent person, but everything that has happened for the past year, both in my personal life as well as what remains of our country, has led me to this point."

He also says in the second paragraph: "Seeing others fall for their lies and blatant hypocrisies, specifically their abuse of using Christianity to further promote their selfish hatred, only fueled my anger. Giving them fair warnings by using fear, which they consistently do to others, was my way to see if they could change. But those fell on deaf ears."

He indicates he was: "Backed into a corner and I've lost a great deal of hope."

He indicates in the third paragraph: "I'm struggling with what to do next. I don't really want to go down a path I can't walk back from if that urge finally breaks me and I act."

The last sentence of that paragraph: "On the other hand, if I can still hold back my urges, I'll be stuck on a

longer path where I'll most likely be caught."

Your Honor, those are the end of the exhibits. I would proffer for the Court additionally items -- additional pieces of evidence regarding this investigation.

As reflected in one of the letters, indicate -- included in the complaint, this defendant, as Your Honor is I'm sure aware, a health care executive was executed in New York in December of 2024 by a man named --

THE COURT: I'm aware. I'm aware.

MR. DELAVIZ: So in one of the letters, that health care executive was Brian Thomason -- Thompson. In one of the letters that this defendant sent in December 22, 2024, shortly thereafter, where he sent the white powder, the line, "Just like Brian Thompson, you will never know when it comes."

THE COURT: Has the white powder been tested?

MR. DELAVIZ: Pardon me?

THE COURT: Has the white powder been tested?

MR. DELAVIZ: Yes, I believe it has been tested.

THE COURT: And what is it?

MR. DELAVIZ: It was kitchen materials.

THE COURT: Okay. Anything else for the record today?

MR. DELAVIZ: Yes.

So I would proffer that his mother gave a statement to law enforcement on the day of the search warrant executed -- execution.

She indicated she had no knowledge of this defendant having contact with his father.

In his statement, he indicated he reached out to his father in late 2023 to ask for money.

The mother indicated that this defendant would not confide in his friends, confide in his sisters. She did not -- the mother did not indicate that this defendant had any financial problems.

She indicated that when this defendant was let go, it was because Macy's wasn't doing well and that he might have received a severance from Macy's.

The mother indicated that she wasn't aware of this defendant taking any powdery substances into his bedroom or this defendant taking any unusual white or manila envelopes out of the house. He would go to the post office to pick up mail.

She was aware he had one gun. She was -- indicated that he had -- he was upset with politics but would not discuss politics with the mother.

During this defendant's statement, he explained how he kept it anonymous.

He used NordVPN. He used Proton Mail. He used multiple email addresses. He used gloves. He indicated his methods were the easiest way to keep it anonymous.

He admitted to using his credit card to pay for items

that he used to commit his crimes.

He admitted to using certain words that are specific to the letters to describe the victims, including pedophile.

He indicated -- throughout the statement -- it was about -- many hours long, he indicates that -- the FBI agents were sort of asking what triggered him.

There was no one thing that triggered him.  He uses the words "lashed out" at random.

He indicated there were money problems.  He also stated:  "I'm not a political person.  It's more a sense that people and what they do, the hypocritical nature, reminds me too much of my dad.  I don't really get" -- "I do get really internally angry with that.  I don't show it."

And then oftentimes, when he saw things -- "actions by politicians reminded me of the control my dad would have in that sense, preying on weaker people, kind of disgusted me."

During his statement -- this investigation revealed that the transmissions were often of people of a certain political bent.

He indicated during his statement:  "Even if it was the other side, I probably would have done the same thing."

And he said when he didn't get reaction to his correspondence, his threats, he felt really annoyed, and he repeatedly talked about lashing out.

He talked about he did this stuff -- he wrote the

letters. He printed the letters. He prepared the envelopes, the labels, all that stuff, the powders, all at the home.

He did this while his mom was sleeping or while she wasn't there.

Lastly, he indicated in his phone call to the FBI that he tends to bottle things up. He's a private person, and he talked about -- being in the financial situation that he was in caused -- contributed to him doing this, and he talked about being stable and then lashing out again.

Let me just review my notes, Your Honor.

(Pause in proceedings.)

MR. DELAVIZ: I have nothing further for purposes of the proffer, Your Honor.

THE COURT: Okay. Thank you.

Ms. MacDonald?

MS. MacDONALD: Yes, Your Honor. I would proffer some additional information.

THE COURT: Thank you.

MS. MacDONALD: Thank you, Your Honor. In lieu of calling Melanie Adams to the stand, I am just going to proffer the information.

She is present, though, should the Court would want to hear from her.

THE COURT: Okay. Thank you.

MS. MacDONALD: She is Mr. Lidderdale's mother.

22

He was residing with her. She has spoken with Pretrial Services.

I would further note for the Court that she is retired. She does not work outside of the home, so she is home full-time.

She is aware of what it would mean to be a third-party custodian. She is willing to do that as well as having him there on any form of location monitoring, working with Pretrial Services in locking up -- a lot of the electronics were already removed from the home, and locking up any of her information, password-protecting, whatever would be necessary. In addition to -- and his sister, Sarah Geise, is here as well.

In addition to proffering that information about where he could return to -- just to continue on with kind of the time line of what the government was providing to the Court, Mr. Lidderdale had reached out to the FBI on February 1st.

Prior to that, they had had no contact with him or understood or knew who he was. There were the emails back and forth which my understanding led to phone conversations, with the request from FBI to Mr. Lidderdale to come to the FBI office on Thursday, the 8th.

As the Court can see from the emails, he contacted FBI, essentially saying: "I'm the one you are looking for. I'm the person making these threats."

So being requested to come to the FBI office, it is common -- logical to assume he knew he was going to be arrested.

Knowing that, he -- in speaking with them -- went to the FBI office, interviewed with them.

By all accounts, it sounds like -- I haven't seen the interview, but from what the government is proffering -- cooperated with the FBI, identifying if he had guns, where those guns were located, answering their questions.

My understanding is that interview was quite a few hours before he was brought to the Court the following day, on Friday, to begin the initial.

Beyond that, I think the rest would be argument.

THE COURT: Okay. Thank you so much. Before I allow both sides to argue, I remind counsel of the factors I'll be considering here today: The nature and circumstances of the alleged offense; the weight of the evidence against the defendant; the history and characteristics of the defendant; and, finally, if anyone's safety would be at risk if I were to release him.

With those factors in mind, I'll allow the United States to go first here today because it is their burden.

Mr. Delaviz?

MR. DELAVIZ: Thank you, Your Honor.

Your Honor, fundamentally, the government submits that

24

there are no conditions that the Court can impose to limit this defendant's ability to engage in this conduct again if he were to get out.

He -- there is no condition that could limit his ability to use the mail or his ability to use a computer or a telephone or to have others do it.

He did this for ten months -- while living with his mother. He indicated he did much of this while she was asleep or wasn't at the house.

It can't be expected that, if he were to return to the home, she would monitor him.

He is obviously a technologically savvy person. I -- the Court -- any technological imposition that they impose, this defendant could find a way around it.

He engaged in this activity over ten months. The purpose of -- one of the significant purposes of the 100 series is to demonstrate how often he did this, for how long. He woke up, many mornings for ten months and did it again and again and again.

And these letters are not veiled threats. They are not subtle threats. They are: "I will kill you. I will shoot you in the head."

They are sending white powder. He's clear about what he's doing.

He then talks about their wives or their spouses.

25

He's sending it not only to offices but to homes.

And then, after he gets no response, he indicates in his statement that he gets annoyed. He gets frustrated, so he escalates. He sends a literal bullet. He sends a kill list.

This defendant -- part of the trouble and the concern the government has, and I believe it goes to detention -- is there is not one single trigger that brought about these letters.

He indicates his financial hardship. His mother doesn't even know about the financial hardship. He talks about the financial hardship, and that's also his reason for stealing from Macy's.

He talks about his dad's controlling ways. He talks about the ways of the politicians and how it frustrates him, and he internalizes it, and his only outlet is sending these threats and this violent conduct.

We don't know how he's going to respond to other stimuli in the community. He might see a news article. He might hear a radio report. His mother might say something. His dad might call the house, and then he's back to his actions.

The guns in the house, he admitted to them in the house, the ammo, but the tactical gear, the lock-picking equipment, the fact that he knew where many of these politicians live,

26

he is ready to act, and --

THE COURT: Is there any -- is there any evidence that Mr. Lidderdale ever went to any of the victims' homes?

MR. DELAVIZ: No. But we didn't --

THE COURT: Is there any evidence that Mr. Lidderdale ever went to any of the victims' offices?

MR. DELAVIZ: I don't --

THE COURT: Where I am going with my questioning is I understand the evidence with regard to the communications. You have made a very strong case as to that.

I want to know if there's any evidence to believe that he took any additional steps beyond what he had at his home, beyond the letters that he was sending from the safety of his home or the local post office.

Like, is there any evidence that he did anything else beyond that?

MR. DELAVIZ: The -- we do not know what Mr. Lidderdale did specifically during these ten months before this past Thursday, because we didn't know --

THE COURT: So the -- so the answer is no. You don't have any evidence. I'm not saying it doesn't exist. I'm saying --

MR. DELAVIZ: Other than the addresses of the multiple public officials that are not public, as far as I know. The home addresses to which he sent them.

27

And I would submit to Your Honor also this:  He sent letters to their home address, of public officials.

Also, there's evidence that some of the return addresses that he used are just random individuals that he, while driving from New Albany to Dublin to go to work, during election season, he would see Trump signs or he would see stuff like that, and then he used those addresses and find the names of those individuals and used those as return addresses.

So he's a sophisticated, resourceful person, and just because there's a black box for ten months, and we don't know exactly what he did, I certainly submit there's plenty of evidence, both with what's found in his house, his 50-plus letters, emails, white powder letters, there's plenty of evidence to suggest he's dangerous.

I would submit that, even if he doesn't go shoot someone in the head, he's dangerous.

The letters, the emails, the white powder letters, that's already violence.  That's already political violence.

You've got victims carrying guns, victims taking days off work, victims developing hives.

Just -- this is already political violence.  This is already violence.  Just because he's not going to actually go impose physical harm on someone, I would submit, that doesn't mean that he should not be detained.

28

His actions are easily possible if he were to be released, and there are no conditions that Pretrial could impose and monitor on him.

We might get a violation report saying that he's engaged in the activity again, but I would submit that's too late.

There's nothing to stop him from engaging in it again if he were to be released.

Thank you, Your Honor.

THE COURT:  Thank you.

Ms. MacDonald?

MS. MacDONALD:  Thank you, Your Honor.

Your Honor, I have reviewed the Pretrial Report with Mr. Lidderdale.  There was no additions or (inaudible), but I also reviewed with him the recommended conditions of release.

And in addition to those conditions, if the Court believes that those are insufficient, there are additional conditions that we propose the Court include:  One of those being that Mr. Lidderdale undergo a mental health assessment.

While there's no history, people can have issues with no prior history.

From the interview that was proffered by the government, it sounds like he had made statements about kind of the -- the breaking point, to the pressure, the

interactions with his father, the things that could incite his internal anger, and that initial condition, it was not recommended that this Court could impose, which was an assessment for him and following through with all treatment that's recommended, in addition to any substance abuse treatment.

I note that Pretrial also recommended GPS location monitoring with a curfew. This Court has the ability to give location monitoring, all the way up into full home confinement, where Mr. Lidderdale is essentially at home with his mother, who is home full-time, but for going to treatment, going to court, meeting with his attorney, or anything else that would be appropriate under Pretrial -- the Court's order with Pretrial supervision.

The government provided a lot of narrative about the letters that were sent. All of the information they provided, with the exception, I guess, of the photos from the search warrant, are contained in the -- essentially contained in a critical report.

They -- there's copies of some of these letters. They are in a similar vein as what was provided by the government.

Pretrial, when doing their assessment on whether or not, for Mr. Lidderdale, there are conditions this Court could impose to assure not only that he is not a flight risk but that the community and himself is safe, they took into

consideration the criminal complaint, the nature of the charges.

It's one of the things that they listed as, "Yes, it could be a reason for an assessment of danger."

But even knowing and understanding what he is accused of, there are conditions that this Court could impose.

As the Court noted earlier, this is not a presumption case.  The Bail Reform Act presumes that there are conditions the Court could impose, and it is only -- it is the rare situation where a defendant would be essentially pretrial -- pretrially [sic] detained but for there being absolutely no combination of any conditions that can be imposed.

Mr. Lidderdale is 39 years old.  He has no prior criminal history.

It sounds like, from the -- the photographs, there may be a -- a prior bad act in an embezzlement from an employer that, by all accounts, it appears he confessed to.  He worked out an agreement for a payment plan on, noting financial difficulties.

His mother may not be aware of the financial difficulties, in part because he was probably trying to protect her, as he was living with her and trying to pay their bills and trying to be able to provide.

But of note is that he cooperated, and that conduct, which seems to be close in time with the current conduct,

and that he cooperated with law enforcement in this case.

He reached out to them first.  He engaged with them. He was requested to come in and meet with them.  He did.  He interviewed with them for hours, it appears.  He explained where he had firearms.

There is no evidence at this point that Mr. Lidderdale did anything other than sending the communications, the threats.  Understanding that is a criminal activity, but, again, there is no evidence during those ten months that he invoked any steps toward actually following through, that these are threats, not actual completions of the threats, I guess, if you will.

And as -- maybe that would be a different scenario for the Court and for Pretrial and their recommendation if there was any evidence that he has ever done anything physically to another individual.

But, again, no prior criminal history, no allegations from anyone that he has done anything to harm anyone outside of what is happening in -- in this case or these allegations.

He has a stable family.  They have been here for his first hearing, for this hearing.  They will continue to come to his court hearings.

His mother is willing to be a third-party custodian. He has lived with his mother for the last ten years at least, verified, between 2015 and 2025, and his sister, from

2015 to 2020.

He is college educated. He has steady employment. He has -- his passport has been seized by the FBI and provided to the Court. The only travel he has taken outside of the U.S. was for school or a vacation.

So not -- taking into account the seriousness of these allegations, it is the defense's position there still are conditions that this Court could impose, and we would urge the Court to impose any and every condition the Court can think of that would assure the appearance of Mr. Lidderdale and also protect the community.

But to detain him pretrial, he will not get treatment. He will not get counseling. He will essentially be locked up 24/7. And that is just -- that is more extreme than this Court needs to do, given the requirements of the Bail Reform Act and given Mr. Lidderdale's prior personal characteristics in addition to the conduct in this case.

THE COURT: Okay. Thank you, Ms. MacDonald.

Mr. Delaviz.

MR. DELAVIZ: Thank you, Your Honor.

Your Honor, I would note that Mr. Lidderdale's family support existed while he committed these crimes. His employment and his education existed while he committed these crimes. His stable home existed and facilitated him committing these crimes.

These are not attempt crimes. These are completed crimes.

These are -- just because he didn't pull the trigger yet doesn't mean that he hasn't committed heinous acts. He hasn't imposed harm on our community --

THE COURT: And no one -- and I don't hear Ms. MacDonald minimizing the allegations in this case.

What I hear her saying is that: What is Mr. Lidderdale going to do now, now that he has been arrested?

And so I need you to focus on that question.

MR. DELAVIZ: I would submit that, over ten months he submitted, I would estimate, 75, just -- more than threatening, just promises to kill, promises to come after people, and he did that time and time again.

He did that act, prompted by God knows what that he read in the news, thoughts about his dad, and politicians saying something like that, and it makes him think of controlling people and injustice, and his response wasn't to seek treatment or to talk to somebody.

His actions were to do this anonymously, deliberately, and just because he in the past week has reached out to the FBI and has come to the FBI --

THE COURT: He -- he reached out in February.

MR. DELAVIZ: I believe that is a misstatement. My understanding is it was May 1st. I heard Ms. MacDonald

34

say that, but my understanding is May 1st, not February 1st.

MS. MacDONALD: From the emails, it looks like it was in May 1st. It was for the week leading up to his turning himself in for this case.

What I wanted to make sure was clear was that he had reached out to them. If I said February, sorry, I misspoke. It was May 1st from the emails.

THE COURT: Okay. Thank you. Thank you.

MR. DELAVIZ: And just because at the end of this twelve -- ten months of -- he reaches out to the FBI and it led to his arrest, I don't believe that means the danger is now completely dissipated and now Mr. Lidderdale is no longer a threat to the community, and there are conditions that we can impose that he could be at the home.

He sent these letters from the home that Pretrial suggests he goes back to. There's -- he sent these letters using printer, using the computer at that desk, and --

THE COURT: Would you agree, though, Mr. Delaviz, that Mr. Lidderdale's power was in large part because he was anonymous and he no longer has that power?

MR. DELAVIZ: Right. And also because of his knowledge of how to do things anonymously, and he talks about various people, be it Luigi Mangione and that execution, he talked about other people who sent white powders, and so he referenced them during his statement to the FBI.

He might see other actors in the news or in social media or wherever and be frustrated, angry, upset again, and again be prompted to act in who knows what way.

He's demonstrated a way -- many ways to be anonymous, to be sophisticated, to change his means.  He goes from letters to emails.  Then he goes to the powder letters.  Then he goes to the web form submissions.  Then he goes to the bullet list and the kill list.

Mr. Lidderdale will not be constrained by the means with -- by which he could engage in this activity again if he were to be released.

He -- there is no limit.  He -- he can be creative and engage in the behavior again, and I would submit engaging in the behavior again is harm to be avoided and harm that conditions of release could not prevent, and so I would submit he should be detained for that reason, let alone the reason that he might act.

I understand that the Court is not concerned about that, but him engaging in threatening behavior again is a -- is -- is a -- is dangerous --

THE COURT:  Wait a minute.  Of course, I'm concerned about him engaging in that behavior.

Of course, I'm -- I'm concerned in him engaging in threatening behavior again.

My question here today is whether I can put conditions

36

on him to make sure that he doesn't -- that there are reasonable assurances that he will not engage in that behavior again. That's the question for me.

Of course, that -- that's all I'm concerned about. That's -- that's my question here today.

So maybe I -- maybe you misspoke or I misunderstood what you were saying. Of course, I'm concerned about it.

As alleged, I mean, these victims were terrorized, and I do not want that repeated. So I'm -- but I -- but I am required to figure out: Can I do anything here to make sure that he doesn't terrorize anyone while he's on pretrial release?

And so that's what I'm trying to figure out here today.

So -- but, of course, I care. Absolutely, I care.

And I'm making sure that I come to the right conclusion here, and that's why I keep trying to ask you to focus on that.

He no -- he no longer has the most powerful tool of anonymity.

I guarantee if another letter that's -- that's similar in any way goes to anyone, the FBI is going to look to Mr. Lidderdale.

There's no way -- I mean, there's no way that he wouldn't be considered at this point.

And we already know that a number of mechanisms that

he used has already -- have already been reviewed -- removed from the home.  Right?

So that's -- so that's what I have to focus on here today.

And I -- and I understand why you are focusing on the nature and circumstances of the alleged offense, and that is an important part of it.

I just -- I'm trying to -- I'm trying to get you to focus on the other factors too because I can't just myopically look and say:  Is he guilty of the alleged crimes?

I have to look at everything else.

So I'm just -- I want to make sure I have -- I hear from you, if you have -- if you have points on the other factors.

MR. DELAVIZ:  I would submit that anonymity can be regained with him starting another email address that we don't know about.

We don't know about email addresses that he creates. He could use his mother's phone or another phone in the house that he's not supposed to be using.

He could change the language that he's using in the threats.  He could direct it to other people.

While many of the individuals to whom the threats were directed here were Ohio-based people, some of them were outside of Ohio.

He can engage in behavior that we're perhaps not focused on and engage in the behavior again.

And so, again, I return to the statutes question of reasonably assuring the safety of the community and that he will appear for court and comply with conditions of release, and I would submit he's un -- he's not anonymous anymore with regard to those email addresses, we're aware of those email addresses and things like that, but with regard to -- I understand Pretrial proposes some restrictions on his ability to use the internet, but I would submit those aren't guaranteed to be successful, especially with a sophisticated actor like Mr. Lidderdale.

And so he can easily engage in threatening behavior, or whatever behavior he wants to engage in, and perhaps we can detect it and learn about it.

But as this investigation demonstrates, a large number of agents working for months on this case were only able to identify Mr. Lidderdale after about ten months, and all this going out.

And so I would submit under the statute, and given Mr. Lidderdale's sophistication, and his ability to deceive -- he's perhaps lost his anonymity here, but his ability to deceive and his inability to control what seems to be his anger or his frustration or his rage, I would submit that there aren't conditions of release that could assure the

safety of the community, and so that's why we're asking for him to be detained.

THE COURT:  Okay.  Thank you, Mr. Delaviz.

So I'm going to order a mental health assessment for Mr. Lidderdale.

I am going to direct Pretrial Services to consider what types of mental health treatment would fit for him. Particularly, I do want to explore the idea of inpatient treatment.

Until I have that assessment, I'm not going to make my final ruling, but I am going to make clear here today that there are certain factors that are in Mr. Lidderdale's favor.

One, he did cooperate with law enforcement.  That's extraordinarily important to me.

The fact that he was willing to be interviewed, the fact that he told law enforcement where the firearms were in -- in his residence, and also looking at government's -- the 400 series of the government's exhibits, I read these letters to the FBI as cries for help.

From my read of the record, Mr. Lidderdale is suffering from a mental health crisis.

If he is assessed, and if it is the case that he can get help, I believe that there are going to be conditions that can be placed upon him to make sure that he does not

40

engage in this terrorizing behavior.

And I've said it already in this hearing. I want to say it again: In no way am I minimizing the harm that the alleged crimes have caused on these victims. It's terrifying.

And if there's no condition that I can place upon Mr. Lidderdale to reasonably prevent him from doing that again, I absolutely will detain him, but I read these emails from him to the FBI -- and, in fact, I read a number of the letters even to the victims as, you know -- as crying out in different ways, and so I want a mental health assessment.

I want to review it. I appreciate, too, that Mr. Lidderdale does have family members who are willing to assist in making sure that Mr. Lidderdale complies with all the terms of his release.

While he has been living with his mother, I hear the -- and I know, you know, in some ways it's easy to look back and say, well, you know, the mother didn't do anything to prevent these letters, or she wasn't aware of what he was doing before, but now she has the information.

And when people have information, they can behave differently, and they can take steps to make sure that somebody is getting the help he needs.

And so I want to get the mental health assessment, but more likely than not, if Pretrial Services can figure out a program for Mr. Lidderdale, I am going to be most

41

likely releasing him based upon the fact that the help -- the mental health help would make sure that he does not engage in the threatening behavior that he's engaged in before.

And notably, he has no other criminal history; and, otherwise, the -- the factors that tend to make an individual a risk to the community, he has -- he has none of those.

Instead, he has a family that supports him.  He has a stable place to live.

In terms of making sure he doesn't use the internet to terrorize individuals, we have -- I have mechanisms through Pretrial to make sure that everything is removed from the home.

And so, I am going to get the mental health assessment, I'll review it, and then we'll go from there.

But, again, more likely than not, I will be finding that that will be a suitable condition for Mr. Lidderdale that could keep the community safe.

I didn't hear Mr. Delaviz make much of an argument in terms of risk of flight, but I also -- I don't find that -- that Mr. Lidderdale is a risk of flight.

So for now, though, Mr. Lidderdale, you are going to remain in custody for the mental health assessment.

So he is remanded to the custody of the U.S. Marshal.

Anything else today on behalf of the United States?

42

MR. DELAVIZ:  No, Your Honor.

Will Your Honor convene another hearing (indiscernible)?

THE COURT:  So once we get the mental health assessment, I'll at least have a status conference with all of you so we can decide how we want to proceed.

And there, of course, are some issues with -- you know, it is still -- Mr. Lidderdale, you are going to -- it's going to be your right as to whether you disclose certain things about your mental health, and -- and we'll have that conversation too.  Okay.

Ms. MacDonald, anything else today?

MS. MacDONALD:  Your Honor, we have waived the preliminary hearing (inaudible) court --

THE COURT:  Thank you.

MS. MacDONALD:  -- and we intend to file a motion to extend the indictment period shortly.

THE COURT: Okay.  That's appreciated.  Thanks so much.

Ms. Rector, will you please you adjourn court.

DEPUTY CLERK:  Please rise.  Court is adjourned.

(Proceedings concluded at 11:50 a.m.)

- - -

43

CERTIFICATE

I, Allison A. Kimmel, do hereby certify that the foregoing is a true and correct transcript, taking into consideration the limitations of transcribing audio-recorded proceedings, before the Honorable Kimberly A. Jolson, Magistrate Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, transcribed by me or under my supervision.

s/Allison A. Kimmel
Allison A. Kimmel, FAPR, RDR, CRR, CRC
Official Federal Court Reporter
 August 25, 2025